J. Edward Kerley (175695)
Dylan L. Schaffer (153612)
Nicholas J. Peterson (287902)
**Kerley Schaffer LLP**
1939 Harrison Street, #900
Oakland, California 94612
Telephone: (510) 379-5801

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

KATHY MYLES, an individual, and WILLIE DANIELS, an individual,

Plaintiffs,

v.

STATE FARM GENERAL INSURANCE COMPANY, an Illinois corporation, and DOES 1 through 10,

Defendants.

Case No.: 2:26-cv-00452-CAS-MBK

**DISCOVERY MATTER**

Magistrate Judge Michael B. Kaufman

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND FURTHER RESPONSES TO REQUESTS FOR PRODUCTION, AND FOR SANCTIONS**

Hearing Date: September 30, 2026
Time: 9:00 a.m.
Courtroom: 255 E. Temple St., Los Angeles, Courtroom 550, 5th Floor

2nd Amended Complaint: 3/16/2026
Discovery Cutoff: 4/15/2027

# TABLE OF CONTENTS

INTRODUCTION ....................6

The Dispute ....................8

The Requests ....................10

I. Water Loss Initiative Evidence ....................11

A. Initiative Evidence ....................11

B. Metrics/Goals and Measured Financial Impact. ....................11

C. Performance Reviews and Incentives. ....................11

II. Training and Guidelines ....................12

State Farm's Pattern of Discovery Misconduct ....................12

ARGUMENT ....................15

I. Law Applicable to Requests for Production, and Motions to Compel Production and Further Responses. ....................15

II. The Court Should Sanction State Farm for its Discovery Misconduct. ........16

III. Water Initiative Document Requests. ....................16

A. The Law ....................16

B. The Initiatives. ....................17

C. Request for Initiative Documents (Document Requests 18, 24-43). .........24

D. Program Metrics, Goals, and Financial Outcome Tracking (Requests 44-75). 25

E. Documents Showing State Farm's Management Practices (Requests 86-94). 26

IV. Training and Guidelines Documents. ....................27

A. Claims Handling Policies, Training, and Guidelines are Discoverable.....27

B. The Court Should Grant the Motion. .......................................................28

## TABLE OF AUTHORITIES

### Cases

*Barten v. State Farm Mut. Auto. Ins. Co.*,
2024 WL 6957687 (D.Ariz. Aug. 22, 2024) ........................................16

*Glenfeld Dev. Corp. v. Super. Ct.*,
53 Cal.App.4th 1113 (1997) ........................................28

*Hangarter v. Provident Life & Acc. Ins. Co.*,
373 F.3d 998 (9th Cir. 2004) ........................................17

*Merrick v. Paul Revere Life Ins. Co.*,
594 F.Supp.2d 1168 (D.Nev., 2008) ........................................17

*Nei v. Travelers Home & Marine Ins. Co.*,
326 F.R.D. 652 (D.Mont., 2018) ........................................ 16, 25

*Pizzuto v. Tewalt*,
136 F.4th 855 (9th Cir. 2025) ........................................8

*Scripps Health v. Nautilus Ins. Co.*,
2022 WL 18781350 (S.D.Cal., 2022) ........................................27

*Sec. Nat'l Ins. Co. v. Constr. Assocs. of Spokane, Inc.*,
2021 WL 1823106 (E.D.Wash., 2021) ........................................ 15, 28

*Shoen v. Shoen*,
5 F.3d 1289 (9th Cir. 1993) ........................................8

*Tong v. State Farm,*
No. 2:24-cv-02219-DSF-MAR, 2024 WL 5472414 (C.D.Cal. Dec. 20, 2024) ........................................ passim

*Vandevert Constr. v. Allied World Specialty Ins. Co.*,
No. C21-197, 2022 WL 18781103 (E.D.Wash. Feb. 14, 2022) ........................................28

### Statutes/Regulations

10 Cal. Code Regs §2695.6(a) ........................................27

**Rules**

Fed. R. Civ. P. 26 ........................................................................................16

Fed. R. Civ. P. 34 ........................................................................................ passim

## INTRODUCTION

State Farm is the largest property insurer in the United States. State Farm does not fear lawsuits which, as this case proves, it can tie in knots for months, resolve if necessary, and bury with confidentiality agreements.

What State Farm fears is *sunshine.*

It shows its hand when it files sanctions motions against lawyers pursuing discovery of its corporate practices, tries to expand the reach of protective orders beyond their breaking points to block spillover work-product among cases, and indiscriminately assigns confidentiality treatment to reems of non-confidential documents to hide its corporate conduct.[1]

But its most effective tool to avoid revelation of its systemic drive to reduce its claims exposure, jealously guarding against degradation of its "Good Neighbor" brand, is as simple as it is effective: delay. State Farm weaponizes the limited time insureds have for fact discovery, conferral rules, courts' limited resources to hear a parade of discovery motions, and its overwhelming resource advantage. As the accompanying declaration of counsel describes in detail, State Farm makes an art of foot-dragging. (Schaffer Decl., ¶¶32-82.)

State Farm's delay tactics bare its indifference to court orders rejecting its objections and legal arguments, whether:

- on the protective order issue, where this Court is the *third* in 18 months to reject State Farm's view,
- as here, where State Farm has unashamedly employed the same

[1] *See* Declaration of Dylan Schaffer ISO Motion to Compel (Schaffer Decl.), ¶133, Exhibits T, U [court orders de-designation of State Farm initiative documents.]

obstructive tactics *this Court* criticized in December 2024 (*Tong v. State Farm,* No. 2:24-cv-02219-DSF-MAR, 2024 WL 5472414, *12-13 (C.D. Cal. Dec. 20, 2024), or

- as most relevant here, where State Farm refuses to disclose the same categories of documents *five courts, including this Court,* in two years over the past two years have compelled it to release relating to its policies and procedures, claim training and guidelines, and systemic efforts to dramatically reduce its claim liabilities over the past decade.

State Farm's delay tactics here have worked brilliantly. The Court gave the Myles a year to obtain the evidence they need for trial. They served the document requests at issue here in April, as early as the Rules permit. But as of the date of the hearing on this motion, State Farm will have consumed *half* of the fact discovery period without producing a page of the disputed materials, including thousands of pages of water initiative documents it was ordered to produce in *Tong,* and *by three other courts since*.

Even if they prevail here, the Myles family will inevitably be left with an unenviable choice between proceeding with one arm tied behind its back, or seeking a continuance. This motion is their opportunity, if not to put an end to the conduct, then at a minimum to finally obtain proof that State Farm's failure to investigate their claim, and its baseless denial, are not a glitch in an otherwise fair process; those practices *are* the process, designed to maximize State Farm's profits while blithely airing ads showing actors playing the Good Neighbor.

Given the broad right to discovery the Federal Rules afford,[2] Plaintiffs should be allowed to tell the jury the real story—the *whole* story. The Court should grant the motion requiring State Farm, after six months of delay, to provide further responses to the requests for production at issue, and to produce all responsive documents, forthwith.[3] It should likewise sanction State Farm, monetarily and perhaps otherwise, for its unabashed misconduct in the discovery process.

## THE DISPUTE[4]

Kathy Myles and Willie Daniels live in Gardena. Kathy awoke on October 7, 2025, to find her kitchen floor and cabinets warm to the touch. There was no such condition previously. She observed water spilling out of an exterior wall. She called a plumber who found a failed pressurized hot water supply line in the home's concrete footing. Ms. Myles reported the loss to State Farm on October 8. The plumber returned to do a bypass and reroute of the line. That work did not disturb the failed portion of the supply line, which remained in the slab.

State Farm inspected the home once on October 10, 2025. Its adjuster did not see the broken line. After the inspection the adjuster asked her supervisor about potentially seeking permission to break into the foundation, but State Farm never

---

[2] "Pretrial discovery is ordinarily accorded a broad and liberal treatment." *Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993); *Pizzuto v. Tewalt*, 136 F.4th 855, 868 n.5 (9th Cir. 2025) [9th Circuit affirms "broad discovery standards" and characterizes the discovery-relevance threshold as a "low bar."]

[3] **Rule 37-1 Statement:** Plaintiffs served requests for production, sets two and three, in April 2026 and July 2026. The parties repeatedly conferred to resolve their differences in good faith. In his declaration, counsel for the Myles described the conferral efforts and certified compliance with Local Rule 37-1. (Schaffer Decl., ¶¶3-4.) This Court held an IDC and permitted this motion.

[4] The facts set forth are based on the accompany Schaffer Decl., ¶¶5-24.

pursued the point. Then the adjuster went on vacation for a week, delaying resolution of the claim and leaving the Myles family in a state of disarray.

Although it was aware the home was occupied by a large extended family, that the water supply had been impacted, that there was now contaminated water that had flowed throughout the first floor of the home, and that its adjuster would now be off for a week's rest while the coverage investigation stalled, State Farm refused to afford alternative housing or benefits for mitigation that was crucially necessary to avoid further damage.

State Farm thereafter sought, and the Myles family provided, related documents including gas and water records, and plumber and mitigation reports and photographs. Both Servpro, the State Farm preferred vendor that dried out the house at the Myles' expense, and Exact Leak Detection, the plumber that found the failed line and did the reroute, told State Farm there was no evidence of any long-term water loss, for instance, microbial growth, deteriorated building components, or buckled floors.

On October 23, 2025, State Farm denied the claim in its entirety. It relied in part on an exclusion for water losses below the surface of the ground, although the failed line was *inside the foundation.* State Farm also relied on an exclusion for "continuous and repeated seepage and leakage," a provision aimed at long-term slow leaks, not failed pressurized supply lines. State Farm's denial letter was required to articulate all facts in support of its coverage disclaimer—but the letter does not indicate how long the loss had been going on, the location, cause, or size of the crack or hole in the failed supply line, or the volume of water that had been released.

The denial letter mentions the plumbers' leak detection report, but the report says nothing about timing or cause. The denial letter cites water and gas bills, but the versions State Farm obtained did not cover the time of the loss and it never sought other evidence before it was sued. Finally, the denial also states it relies on the percipient inspections by Servpro and its adjuster, but Servpro never told anyone the loss was ongoing, and the adjuster seems to have made no specific findings about timing, cause, location, or volume of water released.

The Myles family originally filed this lawsuit in January 2026 and amended in March 2026. (Docket 18.) In their complaint, Plaintiffs allege not only that State Farm failed to competently investigate and adjust their claim, but also that State Farm has an institutional practice, consistent with its conduct here, of failing to investigate and improperly applying exclusions to deny water loss claims in California. (Docket 18, Second Amended Complaint, ¶¶33-37).

State Farm's lawyers served subpoenas on gas and water utilities which produced responsive documents State Farm could easily have obtained in the claim but never did. In August 2026, State Farm's counsel (in argument at the IDC on August 17, 2026) stated for the first time that State Farm would be "further adjusting" the claim based on the utility records, which it now claims support the October 2025 denial.

**THE REQUESTS**

This motion seeks to compel production of documents responsive to two sets of requests, along with further, Federal Rule-compliant responses to those requests: Set Two (RPD-2) served on April 28, 2026, and Set Three (RPD-3), served on July 6, 2026. (Schaffer Decl., ¶¶24-31, setting forth history of requests and responses.)

## I. Water Loss Initiative Evidence

### A. Initiative Evidence.

Plaintiffs sought documents bearing on State Farm's systemic efforts, starting in 2016 and continuing today, to reduce loss adjustment expenses and benefits in water losses in California. Pleadings, transcripts and documents obtained by Plaintiffs' counsel, and publicly disclosed evidence, prove the existence of a variety of consultant-driven efforts, approved by and involving State Farm's senior-most managers, to cut claim liability, which manifested in a large number of baseless water loss denials in this state, including this claim. (Schaffer Decl., ¶30(b), Exh. A, RPD-2, Requests 18, 24-43).

### B. Metrics/Goals and Measured Financial Impact.

As essential element of State Farm's cost-cutting initiatives is its intensive setting and tracking of performance metrics, goals, and financial outcomes. We sought related documents. (Schaffer Decl., ¶30(c), Exh. A, RPD-2, Requests 44-75).

### C. Performance Reviews and Incentives.

Plaintiffs allege that using predictive models and AI, among other tools, State Farm audits paid water loss claims in California, identifying what it describes as "errors" (also called "findings") and missed "opportunities" related to "quality", "accuracy", and "consistency". Where, based on its audits, it concludes it should have denied the claim entirely, or paid less, an indispensable element of State Farm's systemic loss reduction effort involves managing claims staff at all levels, including the most senior claims employees, in response to audit results and performance metrics, goals, and financial outcomes. Plaintiffs therefore sought

documents relating to State Farm's performance metrics and targets, performance reviews, incentives, coaching, and audits of the State Farm personnel both directly and indirectly involved in the investigation and adjusting of Plaintiffs' claim. (Schaffer Decl., ¶30(d), Exh. A, RPD-2, Requests 86-94).

**II. Training and Guidelines**

Plaintiffs sought State Farm's policies, procedures, training, and guidelines, related to the investigation and adjusting of water losses in California, including application of the two exclusions at issue here. (Schaffer Decl., ¶30(a), Exh. A, RPD-2, Requests 17, 19-23, 82-85; Exh. D, RPD-3, Requests 103-114.)

**STATE FARM'S PATTERN OF DISCOVERY MISCONDUCT**

State Farm has a long and court-acknowledged practice of weaponizing the discovery process to gain strategic advantage. This Court acknowledged the practices in *Tong v. State Farm,* No. 2:24-cv-02219-DSF-MAR, 2024 WL 5472414 *12-13 (C.D.Cal. Dec. 20, 2024).

That Court was sufficiently troubled by the misconduct that, in addition to compelling production of broad swaths of documents relating to State Farm's water initiatives, related internal and external consulting, training, and personnel information, it granted plaintiffs' request for a hands-on inspection of State Farm's intranet and claims system. *Id.* at *11-13. But *Tong* resolved before the documents were produced or the issue of inspection—which the District Court stayed pending the productions—was finally resolved.

State Farm's misconduct has the following elements:[5]

[5] These allegations are based on the accompanying Schaffer Decl., ¶¶32-82, which describes in detail State Farm's pattern of discovery abuse in several cases

**First,** responding to requests for its policies, manuals, procedures, training, and guidelines bearing directly on State Farm's claims handling practices—categories courts have long found to be discoverable—State Farm effectively issues itself a protective order. It does not indicate will produce responsive documents. In violation of Rule 34(b)(2)(C), it does not state that it has found but is withholding responsive documents, let alone describe the scope of the withheld documents. Rather, without regard for the specific contents of the request, State Farm promises, generically and identically across its responses, to produce the same three categories of generic documents: Operation Guides, Jurisdictional Resources, and Standard Claim Practices, but only after a protective order issues. (Schaffer Decl., ¶¶34-43.)

**Second,** in addition to promising the three categories of documents in response to every request, State Farm responds with boilerplate objections, although courts routinely reject those objections and compel production. *See* Schaffer Decl., ¶¶154-161, discussing orders in *Tong* and *Pachall*.

**Third,** even as to the generic categories of documents State Farm agrees to produce, the insurer produces nothing, instead triggering briefing on the *terms* of the protective order, although it has repeatedly (three times, now, as the Court knows from prior briefing and its own order) failed to convince courts that its proposed restrictive terms should apply.

**Fourth,** aware that it is unlikely to be permitted to rest on its objections as to

---

including this case. Given space limitations, we neither touch on every case in which these practices have occurred, nor do we restate the evidence here. But we urge the Court to review the factual allegations and supporting evidence in the accompanying declaration of counsel.

many categories, after consuming weeks with conferrals and other court process, State Farm agrees to amend and produce some documents, as it has done here, but:

- despite contrary orders in *Tong* and *Pachall,* it refuses to produce guidelines documents other than those that have been reviewed or relied upon by the adjusters in the claim, although, contradictorily, it produces thousands of pages of Operations Guides, Jurisdictional Resources, and Standard Claims Practices, without evidence *those* materials were reviewed by anyone;
- it fails to provide responses compliant with Rule 34(b)(2)(C) indicating either a full search and production of all non-privileged, responsive documents, or a statement that it is withholding documents in reliance on its objections; and
- in violation of Rule 34(b)(2)(B), it fails to produce even the promised documents with its responses or supplemental responses but instead engages in what it describes as a "rolling production", the timeline for which is known only to and controlled entirely by State Farm. Here, in its original and two supplemental responses to Plaintiffs' requests for training and guidelines (Schaffer Decl., Exhibits B, C, S), State Farm says it is *still searching*. In the latest supplement (Exhibit S), served *three days before this motion was due*, State Farm indicated its *search,* but not its production, will be completed by September 4, *more than three months* after it promised to produce a narrow set of documents. In abject violation of the Rule, it does not say when its *production* will be completed. (*See, e.g.,* Schaffer Decl., Exh. S,

p.35:16-20.)

**Fifth,** State Farm eventually produces lots and lots of documents, but most are non-responsive. Here, State Farm produced thousands of pages in categories it knows have nothing to do with the requests, or the case, for example: deceased insureds, child support liens, returned mail, and washing machine losses.

None of this is new, as the *Tong* order and the accompanying declaration of counsel show. None of it is accidental. It is a well-worn scheme. State Farm employs these tactics because they work; they have worked here. Even if the Court sides in whole or in part with the Myles family on the issues articulated here—as have *five previous courts*—none of the documents will be in the hands of their lawyers until substantially more than half-way through the discovery process.

## ARGUMENT

### I. Law Applicable to Requests for Production, and Motions to Compel Production and Further Responses.

"The purpose of discovery is to make trial 'less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent possible,' … and to narrow and clarify the issues in dispute." *Sec. Nat'l Ins. Co. v. Constr. Assocs. of Spokane, Inc.*, 2021 WL 1823106, at *2 (E.D.Wash., 2021). "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* In moving to compel, the moving party must demonstrate both

relevance and proportionality. *Tong,* 24 WL 5472414, *2. The opposing party bears the burden of showing why the discovery should not be allowed. *Ibid.*

## II. The Court Should Sanction State Farm for its Discovery Misconduct.

State Farm's litigation tactics, which the *Tong* court criticized nearly two years ago, and which are State Farm's routine pattern in bad faith litigation, have real-world consequences for plaintiffs like the Myles family. Proof of that misconduct is described in detail in the accompanying declaration of counsel, paragraphs 32-82. The conduct is as tactical as it is indefensible. If nothing else, the unrepented Rule 34 violations are sufficient grounds for a sanctions award. *See Nei v. Travelers Home & Marine Ins. Co.*, 326 F.R.D. 652, 664 (D.Mont., 2018) [monetary sanction for Rule 34 violation]. The Court likewise is empowered to impose issue sanctions pursuant to Rule 26(g) for improper certifications. Given *Tong*'s findings regarding State Farm's history of discovery misconduct, State Farm's responses and discovery practices here are provably intended to "cause unnecessary delay [and] needlessly increase the cost of litigation …."

## III. Water Initiative Document Requests.

### A. The Law.

When bad faith plaintiffs allege that their claim was denied as part of a corporate-wide scheme to reduce claim liability, the insurer's related corporate programs and management directives are relevant and discoverable under Federal Rules of Civil Procedure, Rule 26(b)(1). *See Tong*, 2024 WL 5472414, at *9-11 (C.D.Cal., 2024) [for a 2024 loss, court allowed discovery of State Farm's water initiatives, including internal and external consulting documents, starting in 2016]; *see also Barten v. State Farm Mut. Auto. Ins. Co.*, 2024 WL 6957687 (D.Ariz.

Aug. 22, 2024) [court allowed discovery back to 2015 of State Farm's corporate-wide financial incentive programs, including business plans, goals, milestones, targets, economic performance measures, combined ratio goals, and severity goals]; *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1011, 1014 n.11 (9th Cir. 2004) [evidence of insurer's corporate programs admissible and supported the jury's finding that defendants had a conscious course of conduct grounded in established company policy justifying punitive damages award]; *Merrick v. Paul Revere Life Ins. Co.*, 594 F.Supp.2d 1168, 1171 (D.Nev., 2008) [same].

**B. The Initiatives.**

The Myles family has alleged (Second Amended Complaint, Docket 18, ¶¶33-37), and the accompanying declaration of counsel sets forth prima facie evidence that beginning approximately in 2016, and continuing through their 2025 claim, State Farm had various initiatives, systems, tools, and management practices, designed to systematically drive down its loss adjustment expenses and indemnity obligations in California water losses. (Schaffer Decl., ¶¶83-153, describing history of discovery of the initiatives and elements of the initiatives.)

The initiatives are driven by a decade-long collaboration between State Farm senior management, its internal consulting and analytics departments, and outside management consultants like Accenture, which efforts trickle down in the form of intensive auditing and coaching to the senior most claims staff, and eventually to claims adjusters and supervisors like those who handled the Myles claim. State Farm's various initiatives target the highest potential "opportunities" areas, which in California means non-weather perils like water; in Oklahoma and other states, it means weather-related losses like wind and hail, and in particular damage to roofs.

Consider this transcript of and instant-message conversation—not the sort of dialogue either participant assumes will ever see the light of day—between State Farm's Director of Property & Casualty Operations, Nicole Manduca, and Dana Jokerst, another senior manager. (Schaffer Decl., Exh. U, p.16.)

> **Transcript for instant messaging (IM) session: Conversation between nicole.manduca.lok2@statefarm.com and dana.jokerst.pmhi@statefarm.com**
>
> nicole.manduca.lok2@statefarm.com [2020-12-02 16:51 :06 (UTC)]:
> The hypothesis helped us see our **biggest buckets of opportunity (indemnity spend)**
> dana.jokerst.pmhi@)_.,statefarm.com 12020-12-02 16:51:24 (UTC)I:
> That is great
> dana.jokerst.pmhi@statefarm.com (2020-12-02 16:51:41 (UTC)]:
> **So Accenture reps will be on the workshop calls**?
> nicole.manduca.lok2@statefarm.com (2020-12-02 16:53:04 (UTC)]:
> **I have to get my head around what that will look like for Water,** but essentially our analysis found that we (SF) replaced roofs at a far higher percentage for small hail/light wind compared to industry average. For example, we replaced 85% on small hail compared to industry average of 8-10%, followed by 65% on light wind compared to industry average of about 5%. When we ran the dollars, **that narrowed our focus of opportunity.**
> nicole.manduca.lok2@statefarm.com (2020-12-02 16:53:14 (UTC)]:
> I believe they will just not sure when that begins.
> dana.jokerst.pmhi@statefarm.com (2020-12-02 16:53:43 (UTC)]:
> Wow! That is significant!
> nicole.manduca.lok2@statefarm.com (2020-12-02 16:54:37 (UTC)]:
> Indeed. That also supported our need for data integrity (updating participants, additional inspections) so we **could track if particular contracting firms drove these outcomes** and/or where our skill opportunities resided.
> nicole.mandnca.lok2@statefarm.com (2020-12-02 16:56:15 (UTC)]:
> **You'll be provided the indemnity spend in the buckets of opportunity - it'll stay at your level and higher.** That's how you'll engage Wendy and the O's on how you prioritize your focus and guidelines. **For example, one of your buckets may be a $5OM opportunity if our Accuracy improves in that space.**
> **dana.jokerst.pmhi@statefarm.com** [2020-12-02 17:01:12 (UTC)]:
> That's incredible

(Exh. U, p.16 (emphases added.)

Here is why this interchange is revealing, and supports an order compelling the requests at issue here:

- First, the parties to the conversation are not claims staff. At State Farm, there are four levels of direct claim staff: adjusters, team managers,

section managers, and claim managers. Ms. Manduca and Ms. Jokerst are above those four levels of claims staff.

- Second, the senior managers repeatedly refer to "opportunity" as relates to wind claims. The conversation shows that "opportunity" means the chance to save State Farm money by paying less benefits. (*See, e.g.,* Schaffer Decl., Exh. U, pp.15, 17, examples of Ms. Manduca and State Farm revealing what they mean by "opportunity" including as applied to water losses).
- Third, these senior executives make clear these efforts also apply to water losses; below we show ample additional proof of the same. Wind/hail and water initiatives at State Farm have run parallel for a decade.
- Fourth, they acknowledge involvement of the consulting firm, Accenture, which we alleged drove adoption of, took part in the creation of, and has been party to the implementation of the water initiatives.
- Fifth, Ms. Manduca's comments make plain State Farm seeks to avoid revelation of these efforts: the "indemnity spend", meaning data relating to how much State Farm pays, and the savings targets and outcomes, will stay at the senior management level. It seems safe to say State Farm's senior executives are aware that its effort to save $50 million by reducing coverage will go over well with customers, agents, and regulators.

In a document from 2020, called "Fire Weather Leadership Business Plan – Accuracy Tactical Plan," State Farm shows that that its wind/hail and water initiatives go hand in hand, and again, that when it refers to "opportunity," it means a chance for State Farm to pay less in its claims: ***"Year-over-year trends indicate***

***Wind/Hail and Non-Weather Water perils provide the greatest opportunity to impact enterprise results***, accounting for 57% of Net Paid Indemnity (NPI) and 70% of claim counts. …Water losses account for 17% of NPT and 21% of claim counts, with Incurred Frequency down 4.9% YOY." (Schaffer Decl., Exh. U, p.17 (emphases added).) A reduction in "Incurred Frequency" is good for State Farm: it means its "errors"—that is, overpayments in paid claims, as measured by its audits—have gone down, as discussed just below.

State Farm's "quality" initiatives are overseen by a "Pillar Team" led by State Farm vice presidents and is led by senior managers including Ms. Manduca and Ms. Jokerst. (Schaffer Decl., Exh. U, p.11.) The Pillar Team "Outcomes" include "Execute on Quality Plans" – in other words, the initiatives at issue here like the "Water Quality Plan." (Schaffer Decl., Exh. U, p.11.)

The success of State Farm's "quality" initiatives are determined by reference to "Fire Frequency Errors," which are measured based on audits which Plaintiffs allege rely on predictive models and AI built by Accenture or other outside consultants, together with State Farm's internal consultants and P&C Analytics departments. (Schaffer Decl., Exh. U, pp.11, 50.) As the exhibit shows, *this approach applies to water claims as well as wind, hail and fire.*

In 2022, for example, State Farm set measures of success, including a Fire Frequency Error rate of 8.2%. (Schaffer Decl., Exh. U, p.11.) State Farm established a management communications strategy for the "Quality Pillar Strategy", including driving "improvement in claim handling accuracy and operational expense"; but critically, State Farm measure improvement *unidirectionally in favor of its bottom line*. (Schaffer Decl., Exh. U, p.14.)

Other strategic targets include reducing "error rates," "volatility of claim loss trends," "execut[ing] on budget goals," and "achiev[ing] and sustain[ing] productivity targets." (Schaffer Decl., Exh. U, p.14.)

State Farm's *P&C Analytics–Claims* tracks the financial impact of the initiatives on State Farm's bottom line. In January 2023, forwarding P&C Analytics data, Ms. Manduca say that since scaling up the wind initiative in 2020, for the years 2020 and 2021 alone State Farm had achieved a "$1.14B decrease in indemnity …." (Schaffer Decl., Exh. U, p.24.)

State Farm's senior most executives, including Ms. Manduca, took part in and/or presented information regarding claims-related initiatives to State Farm's aptly named "Fix Profit Task Force" which included Jon Farney, then the CFO and the now CEO of State Farm.

In *2024*, a presentation, to the Fix Profit Task Force including, among other elements, a plan to "*Continue focus on coverage for Water, Wind, and Hail.*" (Schaffer Decl., Exh. U, p.40.) The presentation "headlines" show State Farm's initiatives are doing well, included the following: "Water: the number of errors [also called "findings"] decreased -6% and their size decreased -14%." (Schaffer Decl., Exh. U, p.41.) "Errors" or "findings are instances in which, per State Farm's audits, State Farm paid too much either because it covered an excluded claim, or overpaid benefits. "Errors" never goes the other way—i.e., they mean State Farm improperly denied a loss or *underpaid* for repairs other benefits.

State Farm's Fix Profit Task Force headlines indicate: "*Water coverage* improved from YE2022 (7.36%) to YE 2023 (6.1%). The team improved from 8.5% in January to 6.1% YTD. (Slide 7)." (Schaffer Decl., Exh. U, p.42.) A chart

showing improvements in "coverage" in 2023 shows that "findings" or errors are driven by "reinspection" results—but these are not physical re-inspections of homes; instead, the documents will eventually show that "re-inspection" at State Farm involves an internal audit of claim outcomes, which audits are driven by consultant-created predictive models and AI. (Schaffer Decl., Exh. U, p.43.)

State Farm liberally employs acronyms and euphemistic phrasing to soften the blow of these documents, expressly avoiding terms like "targets" in its presentations, instead preferring words like "selections." (Schaffer Decl., Exh. U, p.48.) In the document cited, senior managers insist on *removing* the offending word *targets* from a Fix Profit Task Force presentation.

State Farm's initiatives aim at:

- Coverage – State Farm seeks to aggressively apply exclusions to reduce claim liability and loss adjustment expenses;
- Scope – State Farm reduces paid claim liability by limiting the extent of covered damage as to which it must pay for repairs;
- Estimate writing – State Farm seeks to reduce benefits payments by writing its own estimates rather than relying on contractors;
- Estimate reconciliation – State Farm avoids costs by "reconciling," meaning declining to pay or cutting the estimates of its customers' contractors when they exceed State Farm's numbers, often by reliance on competing estimates from its own preferred and therefore biased vendors;
- Additional layers of, and accelerated, management review to ensure corporate policies are being followed;
- Vendor management – State Farm relies on and recommends preferred

vendors incentivized to keep costs down.

(Schaffer Decl., ¶151.)

Elements of the "quality" initiatives include:

- "Re-inspections" – which, as noted, are not re-inspections at all, but instead internal audits by State Farm which employ predictive models and AI to review *paid claims* to determine if State Farm has overpaid—thus demonstrating a missed "opportunity"; these include claims State Farm believes should have been but were not denied in reliance on the two exclusions at issue in the Myles claim;
- authority reductions across its perils to ensure that higher level managers are involved in claim coverage decisions;
- aggressive application of the water loss-related exclusions without clear standards, increased claim closure pressure; and
- constant measurement and tracking, and resulting reviews among senior managers, of:
  - Claim metrics, goals, and financial outcomes reflected, for example, in the "Fire Frequency Error" rate that appears in Exhibit U, p.11, and
  - Intensive management to those metrics, goals, and outcomes at all levels of claims staff, including adjusters, claim managers, section managers, and in particular claim managers who sit atop claims staff.

(Schaffer Decl., ¶¶152-153.)

As the *Tong* court was convinced nearly two years ago, and as is now powerfully supported by recently-revealed documents, State Farm has over the past 10 years implemented these programs, set metrics, established goals, assiduously

measured and tracked the financial impact of the programs, and managed its claims staff at all levels by reference to those metrics, goals, and outcomes. Four previous courts[6]—*Tong, Savas, Hursh* and *West*—have ordered State Farm to produce the related documents, including each of the categories at issue here for the same time period at issue. (Schaffer Decl., ¶¶101-127.) This Court should do the same as to the categories set forth below.

**C. Request for Initiative Documents (Document Requests 18, 24-43).**

State Farm has objected to, and declines to produce, documents relating to its decade-long effort to cut its claim costs, now proven beyond dispute. Its objections are unavailing. Consider Request 18 (Schaffer Decl., Exh. A, p.12:4-5), which seeks internal and external consulting reports bearing on State Farm's handling of water loss claims in California.

Consultants like Accenture, together with State Farm's internal consulting, analytics, and reinspection departments, have been essential players not only in the creation of the initiatives, but also in implementing auditing and tracking tools State Farm has relied on over the past decade, saving the carrier billions. Accenture's involvement is now *proven* by conversations between State Farm's senior-most executives. (Schaffer Decl., ¶134, Exh. U, pp.16, 29, 32.)

*Tong* ordered State Farm to produce the documents. (*Tong*, 2024 WL 5472414, *9, granting motion to compel production of Tong Request 145, which appears at Schaffer Decl., Exh. J, p.13:22-24: "All DOCUMENTS containing any report or presentation from 2010 to present, from any person or entity employed by

[6] The *Pachall* order to compel was focused on training documents.

YOU, or any person or entity retained by YOU, relating in whole or in part to YOUR INVESTIGATION and/or ADJUSTING of water losses.")

State Farm objects, as it did identically in *Tong,* that the request is "potentially burdensome." But the assertion that something is *potentially* burdensome is not an objection. It also says the documents are not relevant or proportional. The relevancy argument makes sense only if one ignores the authorities set forth above which hold that corporate policies that may have impacted claims outcomes are discoverable. We allege, and can now prove, that Accenture and internal claims consultants motivated, drove, developed, implemented, and managed these initiatives. Discovery of these documents is highly relevant, and plainly proportional, as *Tong* found.[7]

### D. Program Metrics, Goals, and Financial Outcome Tracking (Requests 44-75).

The recently revealed documents, detailed above, should make plain that proof of the initiatives will begin and end with *numbers,* awash in a sea of euphemistic phrases and acronyms – for example, claims audited, "finding" and "error" rates, "opportunities" and "improvements" in water coverage, estimatics, reconciliation, and mitigation. (Schaffer Decl., Exh. U, p.42.)

Ms. Manduca put a number on the financial impact of the wind and hail initiative—$1.4 billion over one year. (Schaffer Decl., Exh. U, p.24.) If the initiative evidence itself is discoverable, as the cases, including *Tong,* uniformly

[7] Also, in violation of Rule 34(b)(2)(C), State Farm's response to Request 18 never states whether responsive material was withheld, a circumstance upon which the Court can rely to overrule all the objections. *Nei v. Travelers Home & Marine Ins. Co.*, 326 F.R.D. 652, 657 (D.Mont., 2018).

hold, State Farm's objections to production of the same evidence as relates to *water* initiatives, on relevance, proportionality, or burden grounds, are unavailing. (Schaffer Decl., Exh. B, pp.76:27-77:20.) The data sought by Requests 44-75 is at the heart of the matter and is therefore discoverable. State Farm's commercial interests are protected by the protective order.

**E. Documents Showing State Farm's Management Practices (Requests 86-94).**

An essential—perhaps *the* essential—element of State Farm's various water (and wind, hail, fire, etc.) initiatives is its management of claim staff at levels all the way up the chain to ensure the company takes advantage of "opportunities" and "improves" its claims "quality," "accuracy," and "consistency"—which, as explained, mean savings to State Farm.

State Farm stripped lower-level adjusters of authority to settle claims because by leveling up coverage and payment decisions, it could more heavily control outcomes. State Farm conducted audits using predictive modeling and AI, and intensified and accelerated management review, to ensure oversight of staff.

But ultimately "coaching" and "messaging" to its staff—from claim managers overseeing hundreds of employees and thousands of claims all the way down the chain to line adjusters—including insistence on "accurate" application of the exclusions at issue in this case, was required to bring down loss adjustment expenses and benefits payments.

Plaintiffs' requests seek documents setting forth performance metrics and goals (Exhibit A, Requests 86, 87), and detailing reviews not only for the adjuster and supervisor who handled the Myles claim, but also their managers up the line—namely, section managers, claim managers, and claim consultants. (Exhibit A,

Requests 88-94.)

"Case law is clear that employee records and evaluations are generally discoverable in bad faith insurance cases." *Tong,* 2025 WL 5472414, *7-8, citing cases. Personnel files may reflect not only specific claim behavior, but corporate policy and culture. *Id.* at *8; *see also Scripps Health v. Nautilus Ins. Co.*, 2022 WL 18781350, at *5-6 (S.D.Cal., 2022) [allowing discovery of both performance reviews and financial incentive documents].

As Plaintiffs made clear at the IDC, they do not seek full personnel files; they have no interest in documents relating to sexual harassment claims or health issues. They seek, and under the circumstances and the law are entitled to, the performance and incentive-related documents described in Requests 86-94.

## IV. Training and Guidelines Documents.[8]

### A. Claims Handling Policies, Training, and Guidelines are Discoverable.

California property carriers are required by law to "adopt and communicate" to its claims staff "written standards for the prompt investigation and processing of claims …." 10 CCR §2695.6(a). A failure to do so is a factor upon which a jury may base a finding that a carrier in a particular claim acted in bad faith.[9] "Claims manuals and guidelines are relevant in insurance bad faith cases because they allow a party to compare defendant's standards for evaluating claims with the

[8] Schaffer Decl., Exh. A, RPD-2, Requests 17, 19-23; 82-85; Exhibit D, RPD-3, Requests 103-114).

[9] *See* CACI 2337, Factors to Consider in Evaluating Insurer's Conduct ["(c) Failed to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under its insurance policies."]

conduct of defendant's agents....” *Sec. Nat’l Ins. Co.*, 2021 WL 1823106, at *4.[10] *Tong* holds the same. 2024 WL 5472414, at *9. The court (as well as the *Pachall* court, *see* Schaffer Decl., Exh. H) rejected State Farm’s view that that policies, guidelines, or manuals are discoverable only upon proof that the staff involved in the claim reviewed the training or guidelines.

**B. The Court Should Grant the Motion.**

In April 2026, the Myles sought ten categories of training and guidelines documents. (Schaffer Decl., Exh. A, Requests 17, 19-23, 82-85, 103-114.) The definitions limit the requests to documents applicable to claims handling in this state. The requests are similarly limited to the decade prior to the loss, which is appropriate because that is the period in which (as the *Tong* court held) it is alleged State Farm has implemented its water initiative programs.

Now consider State Farm’s response to one such request, Request 17, served June 1, 2026. (Schaffer Decl., Exh. B, pp.32:11-34:6.) The request is for “guidance,” broadly defined, relating to State Farm’s investigation and adjusting of water losses. State Farm’s two-and-a-half-page response includes boilerplate objections, a variety of legal argument, and a description of its meaning of the phrase “Claim File”, which phrase is not in the request. State Farm promises to

[10] *See also Glenfeld Dev. Corp. v. Super. Ct.*, 53 Cal.App.4th 1113, 1116 (1997) [California court cites multiple state cases which have held that claims manuals are discoverable and admissible in insurance coverage disputes]; *Vandevert Constr. v. Allied World Specialty Ins. Co.*, No. C21-197, 2022 WL 18781103, at *5 (E.D.Wash. Feb. 14, 2022) [ordering defendant to produce “any and all claims manuals, memoranda, directives, letters, or other forms of written or computerized communications that were in effect at the time the claim in this case was evaluated and denied and which governed the handling and determination of the claim at issue in this case,” as well as same regarding “claim settlement policies”].

produce the three generic categories of its choosing—Operations Guides, Jurisdictional Resources, and Standard Claims Practices, but never simply says it will search for and produce responsive documents. Nor does it say it is withholding responsive documents in reliance on the objections.

State Farm served the identical response to Requests 19-23 and 82-85. (Schaffer Decl., Exh. B, pp.36:8-45:28.) It produced no documents at all *for six weeks,* until July 15, 2026. Most of those documents are non-responsive. After multiple conferrals, State Farm served supplemental responses on July 7, 2026; *it had yet to produce a page of responsive documents*. (Schaffer Decl., Exh. C.)

If the supplements were supposed to be curative, they failed. Consider renewed response to Request 17. (Schaffer Decl., Exh. C, pp.34:14-35:2, 130:27-138:13.) After unnecessarily repeating its prior boilerplate objections, State farm (a) failed to indicate it had searched for and would produce responsive documents, (b) *again* indicated it would produce the three generic categories it had previously promised to produce but *still* had not done so, (c) indicated it would produce training transcripts, which have nothing to do with the request, and (d) again fired up its delay and obstruction machine: instead of saying it would produce and *producing* even the narrow category of documents reflecting training actually provided to the two adjusters in the claim, State Farm says it is "completing an additional search" for such documents. (Schaffer Decl., Exh. C, pp.34:26-35:2.)

The additional supplemental responses are identical, and identically inadequate and violative of Rule 34. (Schaffer Decl., Exh. C, pp.39:20-48:16.) In some instances, relating to training and guidelines requests, State Farm failed to supplement. (*See* Schaffer Decl., Exh. C, omitting supplement to Exh. A, Requests

82-85, directed at guidance available to the claims staff involved in the Myles claim.) Further supplemental responses arrived on August 21, 2026, continue the Rule-violative delay tactics. (Schaffer Decl., ¶¶67, 68, Exh. S.)

On July 6, 2026, Plaintiffs served a follow-up Set Three, relating to training and guidelines materials. (Schaffer Decl., Exh. D, Requests 103-114). *All* of these requests fall within the categories requests in April; all responsive documents should have been produced in June. But concerned about the ongoing delay, Plaintiffs identified specific documents their counsel *knows* exist because of productions in prior litigation. Predictably, State Farm's responses (Schaffer Decl., Exh. E), fail to indicate a diligent search and production. Rather, State Farm mostly objected and refused to produce responsive documents on the theory that training and guidelines documents not reviewed by the staff who adjusted the Myles claim are not discoverable. (*See, e.g.,* Schaffer Decl., Exh. E, pp.40:7-60:2.)

Both *Tong* and *Pachall* rejected that theory. State Farm has no case from any jurisdiction to support its theory. The Court should follow the authorities cited, and the rulings in *Tong,* and *Pachall,* and grant the motion as relates to Requests 17, 19-23, 82-85, and 103-114. It should require State Farm to amend its responses to withdraw all objections and state that it will conduct a diligent search for and produce all responsive documents in thirty days.

Date: August 24, 2026

/s/Dylan Schaffer
Dylan Schaffer
Counsel for Plaintiffs