J. Edward Kerley (175695)
Dylan L. Schaffer (153612)
Nicholas J. Peterson (287902)
**Kerley Schaffer LLP**
1939 Harrison Street, #900
Oakland, California 94612
Telephone: (510) 379-5801

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

KATHY MYLES, an individual, and WILLIE DANIELS, an individual,

Plaintiffs,

v.

STATE FARM GENERAL INSURANCE COMPANY, an Illinois corporation, and DOES 1 through 10,

Defendants.

Case No.: 2:26-cv-00452-CAS-MBK

**DISCOVERY MATTER**

Magistrate Judge Michael B. Kaufman

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND FURTHER RESPONSES TO REQUESTS FOR PRODUCTION, AND FOR SANCTIONS**

Courtroom: 255 E. Temple St., Los Angeles, Courtroom 550, 5th Floor

2nd Amended Complaint: 3/16/2026
Discovery Cutoff: 4/15/2027

## INTRODUCTION

Plaintiffs Set Two document requests were, in relevant part, directed at Plaintiffs allegations that from approximately 2016 to present State Farm senior executives:

- Undertook a series of efforts designed to "fix"—meaning *increase*—the company's profits;
- One emphasis of those efforts was the reduction of indemnity paid in non-weather water losses by "improving" coverage outcomes; and
- Specifically, without alerting its customers or rate-setting regulators, State Farm sought to drive up water loss denial rates in California.

Plaintiffs sought the Court's order compelling State Farm to produce documents showing the substance of those efforts.

At the October 15 hearing on Plaintiffs' Motion to Compel, the Court asked Plaintiffs to identify, as specifically as they are able, the documents they seek through their Set Two Requests 18 and 24–43, and where they believe those documents exist. (Supplemental Declaration of Dylan Schaffer (Supp. Schaffer Decl.), Exh. A, pp. 56:20–57:3, 59:7–14.) Attachment A to this Supplemental Brief does that.

State Farm told the Court in its briefing and again at the hearing that there has never been any such programs, and indeed that it searched the email of the two claim handlers for the phrase "water initiative" but found nothing, and that "no matter how much we search, we're not going to find that." (Supp. Schaffer Decl., Exh. A, pp.16:15–19, 17:16–20.) In response, the Court indicated that "the terminology doesn't matter here, just what the documents are[]", and that as the

*Tong* court held, Plaintiffs are entitled to documents showing State Farm's practices changed after 2016. (Supp. Schaffer Decl., Exh. A, pp.18:12–15, 22:25–23:7.)

When Plaintiffs served the document requests at issue here, having at that time only superficial knowledge of the substance of State Farm's water-coverage programs, they necessarily framed the requests broadly. Until recently, Plaintiffs had no way to *prove* that State Farm's assertions are wrong.[1]

But the circumstances in two Oklahoma cases much like this one—stand-alone bad faith cases by consumers whose homeowners claims were denied in reliance on policy exclusions that are the focus of State Farm's coverage initiatives—have altered the landscape dramatically. In those cases, lawyers likewise served general requests for program documents. In those cases, courts rejected the same relevance, burden, and proportionality arguments State Farm relies on here. And in those cases, faced with the same sort of broadly framed requests at issue here, State Farm knew what to look for, searched, and produced thousands of responsive documents.[2]

Now that an expert retained in both cases has reviewed the Oklahoma productions, and the *West* and *Hursh* courts have placed key documents in the public record, Plaintiffs can go a considerable way toward providing the concrete

---

[1] The Federal Rules and related Advisory Committee Notes acknowledge these imbalances, requiring courts to consider the comparative access to relevant information in deciding the proportionality question. Fed. R. Civ. P. 26(b)(1), 2015 Advisory Committee Note.

[2] As we discuss below, because of this, State Farm's burden here is greatly reduced because it has *already searched for and produced most of the documents at issue.*

guidance the Court has asked for.

Part 1 of Attachment A has four columns:

- Column 1: a description of the ten categories of documents sought.
- Column 2: the Set Two requests that cover each category.
- Column 3: search terms and search guidance State Farm should employ to locate documents responsive to each category.
- Column 4: references to de-designated Oklahoma documents showing that documents in each category exist and that State Farm has located and produced them in response to requests by the homeowners in the *West* and *Hursh* cases.

Part 2 of Attachment A provides a summary of Part 1: it lists each of Requests 18 and 24–43 and the Part 1 categories responsive to it.

This Supplemental Brief/Attachment A, and the accompanying declarations, fully comply with the protective order in this case; there is no basis to seal them. The pleadings do not attach or reveal the contents of any document produced in this case, confidential or otherwise. The pleadings do not refer to any document from any other source that is not publicly available. The pleadings refer only to document categories, titles, and information in public documents, all completely consistent with the protective order this Court signed after resolving the dispute between the parties regarding the appropriate reach of that order. (Dkt. 37 at 5–9.)

## I. Plaintiffs' Showing.

Based on documents de-designated from the *West* and *Hursh* cases, and the sworn testimony of a claims adjusting expert retained in those cases and here who has reviewed the productions in the Oklahoma cases, Plaintiffs have now placed

before the Court each of the following:

- First, a detailed explanation of the nature of State Farm's "quality" initiatives that have impacted its investigation and coverage of water loss claims in California, with reference to documentary evidence supporting the allegations.[3] That effort continues here and in Attachment A.
- Second, Plaintiffs have now submitted two sets of de-designated documents, from *West* and *Hursh* respectively, which are direct evidence of the existence of the alleged programs, and their operational particulars.[4] Attachment A (Column 4) ties those documents directly to each of the ten categories of documents specified for production, so that the Court can be confident State Farm has, can find, and can produce the documents.
- Third, at the invitation of the Court (at the IDC that preceded this motion) to provide information regarding the scope and relevance of the Oklahoma productions, Plaintiffs have offered the sworn testimony of Mr. Romano, who has reviewed the Oklahoma documents, to explain that Plaintiffs' allegations are fully supported by documents State Farm has,

---

[3] Plaintiffs' MPA ISO Motion to Compel (Plaintiffs' MPA), Dkt. 43-1, pp.17:10-24:7; Schaffer Declaration ISO Motion to Compel (Schaffer Decl.), Dkt. 43-2, pp.30:8-38:16; Plaintiffs' Reply ISO Motion to Compel (Plaintiffs' Reply), Dkt. 55, pp.7:19-10:13.

[4] Schaffer Decl., Exh. U (de-designated documents produced in the Oklahoma cases), which are discussed in Plaintiffs' MPA, Dkt. 43-1, pp.18:1-24:7, and the Schaffer Declaration, Dkt. 43-2, pp.31:20-38:16, and are attached at Docket 43-3, Exh. U; Supplemental Declaration of Mark Romano (Supp. Romano Decl.), filed with this brief, Exh. A.

can locate and produce, and in fact *has already produced* in the Oklahoma cases.[5]

- Finally, Plaintiffs have explained how the circumstances of their claim powerfully support an inference that the full denial was the product of State Farm's systemic effort to drive up denial rates, and not an isolated, objectively considered, evidence-supported coverage decision.[6] They explained that in their claim, the denial followed on the heels of a single inspection, without any expert (plumber, engineer, contractor) input, without State Farm's ever having seen the failed pressurized supply line, and most importantly without State Farm's having evidence of or determining the cause of loss, the volume of water released, or duration of the loss, information State Farm *itself* requires its claims staff to obtain *before a denial can be approved*.

Finally, while State Farm continues to argue that the water programs are a figment of Plaintiffs' imagination, consider this specific, concrete example of how these programs work and how a jury could infer they bear directly on Plaintiffs' circumstances:

- 2020: In its Quality Plan reporting, State Farm noted "California - water handling expectations setting across the state, heightened oversight with TM [team manager] proficiency assessment on *coverage interpretations*,

---

[5] Mark Romano Declaration ISO Motion to Compel (Romano Decl.), Dkt. 55-2, pp.5:22-7:20; Supp. Romano Decl., ¶¶8–20.

[6] Plaintiffs' MPA, Dkt. 43-1, pp.8:8-10:22, Plaintiffs' Reply, Dkt. 55, pp.10:14-12:7.

quarterly assessment of *coverage application*." (Supp. Romano Decl., Exh. A, p.11 (emphases added).)

- 2021: State Farm confirmed that "Reinspection [computerized audits] trending supports the efficacy in the action items currently in place." (Supp. Romano Decl., Exh. A, pp.1-2.) The document expressly calls out "Water: accurate coverage analysis on continuous, repeated, seepage and leakage (CRSL)" (Supp. Romano Declaration, Exh. A, p.2) and indicates that coverage remains an area that can be "improved": "*Coverage determination for CRSL and slab leaks is inconsistent*." (Supp. Romano Decl., Exh. A, p.3 (emphasis added).)
- 2022: Senior executives, mindful of how their conduct will look if revealed, articulated "reduction" targets for "fire frequency errors"[7] and top "FED in finding area – coverage …", but were careful to change the word "reduce" to "target", indicating State Farm's "lawyers would caution us on how lawyers would use the term out of context." (Supp. Romano Decl., Exh. A, p.12);
- 2023: Consistent with its water "quality" programs in 2023, coverage "errors" or "findings" decreased compared to 2022 – *i.e.*, State Farm was

[7] As Plaintiffs have previously explained, "findings" or "errors" are the output of computerized audits of paid claims according to coverage variables. FED is the output of those audits where State Farm tracks both number and dollars according to FED Finding Frequency (FFF), Total FED Dollars, and $FED to Estimate Dollars Written (FEW).

The purpose of the audits is to determine where State Farm is covering claims it concludes should have been denied and integrates those "findings" into formal and informal coaching of its senior-most claims staff.

denying more water losses on coverage grounds and thus driving down its indemnity obligations (Schaffer Decl., Dkt. 43-3, Exh. U, pp.41-42 [showing decrease in both *number* and *size* of "errors" or "findings" relating to coverage];

- 2024: Senior executives confirm that State Farm will "Continue focus on coverage for water…." (Schaffer Decl., Dkt. 43-3, Exh. U, pp.40, 42)
- 2025: Just a few months before State Farm denied Plaintiffs' claim without ever determining the location, cause, or duration of their water loss, State Farm's computerized audits revealed sharp slippage in the "quality" of its "water coverage," with audit "error" or "finding" rates increasing dramatically. State Farm reported that due to that slippage, it had overpaid claims in a single month by $15.3 million. (Supp. Romano Decl., Exh. A, p.19.) State Farm remarks that the "Top FED Driver [fire estimatics difference, which is a measure of adjusting errors] is CAO1 *Water Coverage*…." (Supp. Romano Decl., Exh. A, p.21.)

The water programs targeting are real. State Farm uses sophisticated, AI-enabled predictive models to locate and quantify coverage "errors" for the purpose of improving its bottom line. The documents do not lie. As *Tong* and the other authorities Plaintiffs have relied on hold, proof of such institutional efforts to drive down coverage and drive up profits is discoverable because it bears directly on Plaintiffs' bad faith and punitive damages claims.

## II. Introduction to Attachment A and Response on the Issue of Burden in Advance of State Farm's Brief.[8]

The drafting of the document requests at issue in this motion, occurring as it did before Plaintiffs had access to the de-designated Oklahoma documents, and before their expert (Mr. Romano) had reviewed those materials, resembled a game of pin-the-tail-on-the-donkey. State Farm has all the information; Plaintiffs had only tidbits that had emerged before the Oklahoma revelations.

Now that some "quality" program-related documents are in the public domain, and Mr. Romano can provide insights into the existence and easy availability of the categories of documents identified, it is possible to provide the Court the substantial specificity it has asked for.

Attachment A to this Supplemental Brief seeks to do that concretely. Rule 26(b)(1) accounts for the rest: the Court weighs "the parties' relative access to relevant information," and the Advisory Committee explains that where one side has the information, "the burden of responding to discovery lies heavier on the party who has more information, and properly so." Fed. R. Civ. P. 26(b)(1), Advisory Committee's note to 2015 amendment.

### A. Introduction to Attachment A.

Two introductory points are in order.

First, each category in Attachment A falls within the requests as served. Request 24 defines the WATER INITIATIVE to include every modification to

---

[8] The Court's October 15 order permitted State Farm an additional brief to address the burden issue but it did not provide for a reply. Plaintiffs therefore address burden here.

State Farm's investigation or adjusting of California water losses and every systemic effort to improve "quality," "accuracy," or "coverage" outcomes in those claims; Requests 18 and 43 reach consultant guidance; and Requests 25 through 42 name particular programs that fall within Request 24. (Schaffer Decl., Dkt. 43-2, Ex. A at 6:15–25, 10:6–18, 12:4–5, 12:19–14:26.) Attachment A does not enlarge the requests. At the Court's direction, it describes what they reach, with the specificity, names, search terms, and example references Plaintiffs now have.

Second, the Oklahoma requests that produced the *West* and *Hursh*[9] productions were no more specific than the requests here, and for the same reason: they were served before anyone outside State Farm's management understood how the programs worked. State Farm made the same overbreadth and burden arguments there, the courts ordered production, and State Farm complied. If State Farm could search for and produce the documents produced in *West* and *Hursh,* they can do so here.

**B. The Court Should Reject State Farm's Burden Argument.**

While the Oklahoma requests contained none of the granularity this Court has requested, and that Plaintiffs have now provided to the greatest extent possible in Attachment A, State Farm searched for and produced responsive documents in the Oklahoma cases without any apparently debilitating burden.

State Farm will likely offer declarations reporting that a search for the Attachment A categories would require manual review, hundreds of hours, and a cost that dwarfs its valuation of this case.

---

[9] Schaffer Decl., Dkt. 43-2, pp.28:25-29:6, and Exh. K, Requests 13-15, 20-24, 27-30, 32, 33, 36-41, 43.

But those declarations will not address the searches actually proposed. As Mr. Romano's supplemental declaration shows, State Farm has already searched for and produced a substantial portion of the documents at issue and can reproduce them here *with essentially no burden at all.* (Supp. Romano Decl., ¶¶11-21.)

The Oklahoma productions sit on an e-discovery platform, where the Attachment A search terms can be run in a few hours. (Supp. Romano Decl., ¶¶19–20.) State Farm can comply with an order here by reproducing the responsive subset of the *West* and *Hursh* productions here.

Indeed, although the search imposes no burden that weighs against production, Plaintiffs offer to assume it. State Farm can produce the *West* and *Hursh* productions in this case as they exist on its e-discovery platform, subject to the Amended Stipulated Protective Order (Dkt. 39). Plaintiffs understand the documents produced in *West* and *Hursh* include materials concerning the Oklahoma policyholders' own claims. State Farm can remove those by claim-number search or produce them under the protective order; either way, over-production is not a reason to withhold the rest.

Whatever else State Farm submits, its response should state the cost of reproducing here the documents it produced in *West* and *Hursh*. If it states *that* number, the burden question will answer itself.

Date: October 22, 2026

<u>/s/Dylan Schaffer</u>
Dylan Schaffer
Counsel for Plaintiffs

## ATTACHMENT A

### Part 1 — Documents Sought, by Category

| Documents Sought[1] | Requests Covering Documents Sought[2] | Example Search Terms[3] | Example References[4] |
|---|---|---|---|
| 1. Enterprise-level documents—including for example, communications, | 24 (WATER INITIATIVE, as defined, including | • Fire Business[5]<br>• Business Plan* | Schaffer Declaration (Schaffer Decl.), Docket 43-3, Exh. U, |

[1] Due to Plaintiffs' lack of access to the documents sought here, and general knowledge of substance of the water programs, their Set-2 requests necessarily described categories of documents and water program identifiers broadly. Given information obtained since the service of the requests, the document categories are listed here with considerably greater specificity.

[2] Column two lists the requests applicable to each category of documents specified. Schaffer Decl., Dkt. 43-2, Exh. A, pp.6:15-25, 10:6-27 (defining key terms), 12:19-14:26 (requests).

[3] State Farm can reduce its burden by employing the search terms set forth. The list is not intended be complete; it seeks to provide guidance to reduce State Farm's production burden. There is overlap across document categories.

Each term can and should be additionally run together with a water-loss qualifier to ensure searches are complete: for example, "AND (water OR non-weather OR NWW OR slab OR seepage OR CRSL OR California)". Our proposed terms employ standard e-discovery syntax: an asterisk is a wildcard (for example, "reinspect*" returns "reinspection", "reinspections", "reinspected"); w/N is a proximity operator (that is, within N words); OR joins alternatives. It is likely that AI searches can be run with common language searches.

[4] These references are intended to demonstrate the existence of (a) the programs at issue and (b) the specified document being requested. Mr. Romano further states in his declaration that based on his review of documents produced in the Oklahoma cases, the documents identified exist and the search terms proposed will result in their identification and comparatively burden-free production. Supplemental Romano Declaration ISO Motion to Compel (Suppl Romano Decl.), ¶¶12–21.

[5] These searches are not intended to be case sensitive.

| Documents Sought[1] | Requests Covering Documents Sought[2] | Example Search Terms[3] | Example References[4] |
|---|---|---|---|
| reports, presentations—containing the substance of State Farm's variously named programs aimed in part at "improving" coverage outcomes in water losses, including materials presented at Water Forum and California Fire Claims Discussion sessions and guidance distributed through State Farm's fire claims information channel. | subparts (a)–(g), (i), (j)); also 25–33 and 35–42 (named programs, Water Forum, California Fire Claims Discussion sessions, fire claims information channel) | • Fire Claim* Discussion*<br>• Quality Pillar*<br>• Quality Plan*<br>• Quality Strategy<br>• Quality Leadership Council<br>• Quality Oversight*<br>• Quality Early Monitoring<br>• Water Quality<br>• Water Focus<br>• Water Forum<br>• Water Initiative*<br>• Coverage execution<br>• Pillar<br>• Business Plan<br>• Fire Model Enhancement OR FME<br>• State Model<br>• Fix Profit<br>• Claim Trend* Monitoring<br>• Excellence in Operation*<br>• Executive Accountability | pp.11-14, 17, 24, 40, 43-48, 50, 53-56; Supp. Romano Decl., Exh. A, pp.1, 4, 5, 9, 13, 19, 27, 39 |

| Documents Sought[1] | Requests Covering Documents Sought[2] | Example Search Terms[3] | Example References[4] |
|---|---|---|---|
| 2. Documents referring to and containing the activities of State Farm's "Quality Pillar" team, which oversaw the water programs. | 24; also 25, 28, 29, 32 (Fire Quality Plan; Water Quality Strategy and Plan; Enterprise Quality Plan) | • Pillar* | Schaffer Decl., Docket 43-3, Exh. U, pp.11-14, 17, 24, 40, 43-48, 50, 53-56; Supp. Romano Decl., Exh. A, pp.17, 27-30 |
| 3. Program documents reflecting routing of claims to specialized "Water Teams", including direction of water claims to identified examiners or teams and resulting increases in volume of denials and decreases in indemnity, as well as programs ensuring early coverage analyses and/or accelerated management review of claims to achieve "improvements" in water coverage outcomes. | 24; also 30, 31, 42 (Fire Model Enhancement and its water components) | • Claim intervention<br>• Water Team*<br>• Specialized Team*<br>• Claim Insight*<br>• Claim* w/5 routing<br>• management w/3 (involvement* OR review*)<br>• Quality surv* | Schaffer Decl., Docket 43-3, Exh. U, pp.43, 54-56; Supp. Romano Decl., Exh. A, pp.3, 11, 14, 15, 16, 42 |

| **Documents Sought**[1] | **Requests Covering Documents Sought**[2] | **Example Search Terms**[3] | **Example References**[4] |
|---|---|---|---|
| 4. Documents reflecting limitations on authority and manager authority to ensure early management oversight and review of coverage decisions for the purpose of advancing State Farm's water coverage "improvements." | 24 | • Adjuster authority<br>• Settlement authority<br>• Authority sprint* | Supp. Romano Decl., Exh. A, pp.15, 16, 21, 29, 30 |

| | | | |
|---|---|---|---|
| 5. Documents reflecting program of systematic "reinspection"—meaning computerized audits—of paid water loss claims to tag "erroneously" covered claims, including documents reflecting measurement of such "errors" or "findings", measurement of percentage changes in such findings as compared to estimate dollars written for water losses, and measurement of potential indemnity improvements or overpayments. | 24; also 34 (Claim Review Team) | • Incurred Frequency<br>• COL 37 (State Farm Code for water losses)<br>• Online Reinspection Tool or ORT<br>• Reinspect*<br>• Frequency error*<br>• Frequency target*<br>• Finding Frequency<br>• FED* (fire estimatics difference)<br>• FEW* (FED as a percentage of estimate dollars written)<br>• FFF* (FED finding frequency)<br>• Coverage finding*<br>• Glidepath*<br>• Water Coverage Analysis OR WCA<br>• Oversight Shared Services OR OSS<br>• Fire w/2 Insights<br>• CA01* (finding or error code associated with coverage)<br>• CA0101* (finding or error code associated with coverage)<br>• CA0140* (finding or error code associated with coverage)<br>• CA0141* (finding or error code associated with coverage)<br>• Claim Data Analytics | Schaffer Decl., Docket 43-3, Exh. U, pp.14, 40-43, 47; Supp. Romano Decl., Exh. A, pp.2-4, 9, 11, 12, 19-22, 29 |

| Documents Sought[1] | Requests Covering Documents Sought[2] | Example Search Terms[3] | Example References[4] |
|---|---|---|---|
| 6. Documents reflecting use of predictive models and/or AI models to audit paid claims to evaluate whether coverage was erroneously applied, including documents describing how the models were built, what they measure, and how their results were tested. | 24; also 18 (to the extent the models were built or recommended by a consultant) | • AI/Artificial Intelligence<br>• Predictive model(s)<br>• Claim Insight*<br>• Glidepath*<br>• Water Coverage Analysis or WCA<br>• Oversight Shared Service*<br>• Fire Reinspection*<br>• Fire Claims Insight*<br>• Water Coverage Analysis Insight*<br>• Water Coverage Analysis V2 Insight* Fire Insights and Enterprise Technology | Supp. Romano Decl., Exh. A, p.27, 30, 37 |
| 7. Program documents relating to the "continuous or repeated seepage" exclusion, including documents which show State Farm focused on potential "improvement" and missed coverage "opportunities" relating to the application of the exclusion to water loss claims. | 24 | • Seepage<br>• CRSL OR CRLS<br>• missed coverage<br>• coverage w/2 (opportunit* OR improv* OR accura*)<br>• Closed without payment OR CWP | Supp. Romano Decl., Exh. A, pp.2-3, 21, 29 |

| Documents Sought[1] | Requests Covering Documents Sought[2] | Example Search Terms[3] | Example References[4] |
|---|---|---|---|
| 8. Program documents relating to foundation slab claims | 24 | • Slab<br>• FS (State Farm code for foundation or slab losses)<br>• Foundation w/3 (leak* OR claim* OR loss*) | Supp. Romano Decl., Exh. A, p.3 |
| 9. Program documents showing how State Farm's used a tool called CLIP (Claim Leadership Inventory and Prioritization) which was integrated with its reinspection model to impact claim outcomes at the claims staff level. | 24; also 34 (Claim Review Team) | • Claim Leadership Inventory and Prioritization<br>• CLIP<br>• Direction* Provided | Supp. Romano Decl., Exhibit A, pp. 25, 34, 36 (showing use of the application in wind claims); Supp. Romano Decl., ¶18 (confirming use in water claims). |
| 10. External and internal consultants communications, reports, and presentations relating to State Farm's programs directed at investigation and adjusting of non-weather water loss claims. | 18 (consultant guidance); 43 (consultant identified in prior case); 24 (WATER INITIATIVE includes changes made on a consultant's recommendation) | • Accenture<br>• McKinsey<br>• Claim Data Analytics<br>• Consulting Service*<br>• Consultant direct* | Schaffer Decl., Docket 43-3, Exh. U, pp.16, 49 |

**Part 2 — Requests for Production 18, 24–43[6]/Part 1 Categories (1-10) Responsive to Each**

| Part 1 Requests for Production (column 2) | Part 1 Responsive Categories (column 1) |
|---|---|
| RFP 18 — Guidance State Farm received from any CONSULTANT about investigating or adjusting water losses | 10; also 6 |
| RFP 24 — All documents relating to the WATER INITIATIVE, including subparts (a)–(g), (i), (j) | 1–10 |
| RFP 25 — Western Market Proximity Fire Claims Quality Plan; Fire Quality Plan | 1, 2 |
| RFP 26 — "Water Plan" | 1 |
| RFP 27 — "Excellence in Operations" model or plan | 1 |
| RFP 28 — "Water Quality Strategy" or "Quality Water Strategy" | 1, 2 |
| RFP 29 — "Quality Water Plan" or "Water Quality Plan" | 1, 2 |
| RFP 30 — "Fire Model Enhancement" | 1, 3 |
| RFP 31 — "Fire Model — Property Segment Enhancement: California Water Claim Guidelines" | 1, 3 |
| RFP 32 — "Enterprise Quality Plan" | 1, 2 |
| RFP 33 — "Water Focus" | 1 |
| RFP 34 — "Claim Review Team" | 5, 9 |
| RFP 35 — "Exposure Management Program" | 1 |
| RFP 36 — "fire claims information channel" (STICJ1980) | 1 |
| RFP 37 — Water forum review (STICJ1951), including documents State Farm agreed to produce in Savas (Request 79) | 1 |
| RFP 38 — Materials used in or distributed for the California Fire Claims Discussion sessions on STICJ1951 | 1 |

[6] Schaffer Decl., Dkt. 43-2, Exh. A, pp.12:4-6, 12:18-14:26.

| Part 1 Requests for Production (column 2) | Part 1 Responsive Categories (column 1) |
|---|---|
| RFP 39 — Documents reflecting the contents of the California Fire Claims Discussion sessions on STICJ1951 | 1 |
| RFP 40 — Materials used in or distributed for any California Fire Claims Discussion session | 1 |
| RFP 41 — Documents sufficient to describe the California Fire Claims Discussion sessions | 1 |
| RFP 42 — "Fire State Model – Property Segment Enhancement – Water Claims" | 1, 3 |
| RFP 43 — Documents from a consultant referred to at STICJ1951 about investigating or adjusting water losses | 10 |