J. Edward Kerley (175695)
Dylan L. Schaffer (153612)
Nicholas J. Peterson (287902)
**Kerley Schaffer LLP**
1939 Harrison Street, #900
Oakland, California 94612
Telephone: (510) 379-5801

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

KATHY MYLES, an individual, and WILLIE DANIELS, an individual,

Plaintiffs,

v.

STATE FARM GENERAL INSURANCE COMPANY, an Illinois corporation, and DOES 1 through 10,

Defendants.

Case No.: 2:26-cv-00452-CAS-MBK

**DISCOVERY MATTER**

Magistrate Judge Michael B. Kaufman

**SUPPLEMENTAL DECLARATION OF DYLAN SCHAFFER IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND FURTHER RESPONSES TO REQUESTS FOR PRODUCTION, AND FOR SANCTIONS**

Courtroom: 255 E. Temple St., Los Angeles, Courtroom 550, 5th Floor

2nd Amended Complaint: 3/16/2026
Discovery Cutoff: 4/15/2027

I, Dylan Schaffer, declare under penalty of perjury as follows:

1. I am an attorney licensed to practice in California and before this Court, and am counsel for Plaintiffs in this matter. If called to testify I would do so under penalty of perjury as follows:
2. A true, correct and full copy of the transcript of the hearing before Judge Kaufman on this motion to compel and pending IDCs from October 15, 2026, is attached as **Exhibit A**.

I declare under penalty of perjury this 22nd day of October, 2026, at Oakland, California, that the foregoing is true and correct.

/s/ Dylan Schaffer
Dylan Schaffer
Counsel for Plaintiffs

# EXHIBIT A

EXHIBIT A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION - LOS ANGELES

| | |
|---|---|
| KATHY MYLES,<br><br>Plaintiff,<br><br>v.<br><br>STATE FARM GENERAL INSURANCE COMPANY, et al.,<br><br>Defendants. | Case No. CV 26-452-CAS (MBKx)<br><br>Los Angeles, California<br>Thursday, October 15, 2026<br>1:07 P.M. to 2:36 P.M.<br><br>VIDEOCONFERENCE |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MICHAEL B. KAUFMAN
UNITED STATES MAGISTRATE JUDGE

| | |
|---|---|
| Appearances: | See Page 2 |
| Deputy Clerk: | K. Lozada for J. Muñoz |
| Court Reporter: | Recorded; CourtSmart |
| Transcription Service: | JAMS Certified Transcription<br>16000 Ventura Boulevard #1010<br>Encino, California 91436<br>(661) 609-4528 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES:

For the Plaintiff:

Kerley Schaffer LLP
By: DYLAN L. SCHAFFER
NICHOLAS J. PETERSON
1939 Harrison Street, Suite 900
Oakland, California 94612
(510) 379-5801
dylan@kslaw.us
nicholas@kslaw.us

For the Defendants:

Sheppard Mullin Richter and Hampton LLP
By: JENNIFER M. HOFFMAN
MADALYN A. MACARR
350 South Grand Avenue, 40th Floor
Los Angeles, California 90071
(213) 620-1780
jhoffman@sheppard.com
mmacarr@sheppard.com

Sheppard Mullin Richter and Hampton LLP
By: SARAH A. BLITZ
350 South Grand Avenue, 40th Floor
Los Angeles, California 90071
(213) 617-5521
sblitz@sheppard.com

LOS ANGELES, CALIFORNIA, THURSDAY, OCTOBER 15, 2026, 1:07 P.M.

(Call to Order of the Court.)

THE CLERK: Calling case No. 26-cv-452-CAS-MBK, *Kathy Myles v. State Farm General Insurance Company*, *et al.*

Counsel, can you please state your appearances for the record.

DYLAN L. SCHAFFER: Good afternoon, Your Honor. Dylan Schaffer appearing with my associate Nicholas Peterson for the plaintiffs.

THE COURT: Good afternoon, gentlemen.

JENNIFER M. HOFFMAN: Good afternoon, Your Honor. Jennifer Hoffman of Sheppard Mullin Richter and Hampton on behalf of Defendant State Farm General, and Sarah Blitz and Madalyn Macarr of my office are also appearing.

THE COURT: All right. Very good. Good afternoon, counsel.

MS. HOFFMAN: Good afternoon.

THE COURT: All right. We have quite a bit to discuss this afternoon. I set a hearing because I wanted to walk through the motion that's currently pending on the Court, and then I know, Ms. Hoffman, I believe you approached the Court with a request for an IDC, and it seemed convenient just to put everything on calendar here this afternoon. So why don't we start with the motion to compel. I think that discussion may be meatier, and I think it will bear at least

in part on some of the topics that were raised in the IDC; so it may be more efficient to go that way.

Let me just say at the outset, I found the briefing on the motion to compel, honestly, pretty unhelpful in understanding exactly what's in dispute here, and this is partially my fault. I have authorized the parties, as I have in other cases, to forego the Local Rule 37 process, joint stipulation process, and just file normal noticed briefing here. As a result, I don't think the parties spent a whole lot of time actually talking about the actual requests here, what documents are being sought and what -- the burdens and proportionality.

Mr. Shaffer, I don't think your brief actually even mentions the specific request at issue here until, like, page 24 or something.

So I am just really kind of left at a loss to understand exactly what's in dispute here, what's been agreed to, what's left over, and so what I want to do today is keep this discussion very concrete, tethered to the language of the request here what specifically State Farm has already produced, what they're going to produce but haven't completed yet, and what is remaining that the plaintiffs want here today.

So I'd like to keep the remarks, again, focused on those particular issues. I don't need any discussion today

on the sanctions request that was briefed, I think, fully. I also would like to try to avoid talking about other litigation that the parties here have been engaged in -- or counsel have been engaged in, in the past except to the extent that it bears directly on the issues presented here. For example, I know we'll be talking about *Tong* a fair bit because of the overlap between the issues here and the documents, but otherwise let's, please, keep our discussions focused on the case before the Court here today.

I'll also just say in advance my view is that the requests and RFP -- the third set of requests are not properly before the Court, they weren't subject to the IDC that we had and I authorized briefing on, although, you know, as with the IDC I set for today, I think our discussion and my ruling on the pending motion to compel may resolve a lot of those issues. So keep it -- the requests -- the discussion focused on the requests that are properly before the Court in the motion to compel.

All right. So with that, why don't we just walk through the four categories. I think both parties are in agreement in terms of the categories of documents we're talking about here, although, if you look through them, they seem to be getting lots of different things. But I want to -- I'm going to go a little bit out of order, but I do want to start with Category 1, which is what I think both parties

are referring to -- the "water loss initiative" documents.

I know, Ms. Hoffman, you don't think there's any such initiative -- or at least in the same terms as plaintiff's counsel does, but we can just broadly refer to that for the purpose of the discussion.

So, Ms. Hoffman, can you just describe to me: What exactly have you produced responsive to the Category 1 documents, the water loss initiative, in this case or have you withheld --

MS. HOFFMAN: Right.

THE COURT: -- any responsive documents?

MS. HOFFMAN: Thank you, Your Honor.

And to back up, you know, we do disagree with plaintiff's characterization of a, quote, "water initiative." We disagree there was ever any initiative, as alleged, to deny covered water loss claims. We offered testimony from the same expert that they've pointed to in their motion saying, "Yeah, I've never seen that except with respect to this claim that I'm looking at here," which the Ninth Circuit and the district court found was not covered.

So what -- the "water initiative" phrase has come up in connection with "quality claim handling" efforts, and it came up years ago. That same expert said, "Hey, I looked at a deposition of someone who mentioned a water initiative, and then I told counsel to go and ask about it," and that's

where we are. So that phrase was used in connection with -- in connection with furthering "quality claim handling" efforts, making sure that claims were being handled properly, were being investigated properly, were -- coverage determinations were proper, that payments were proper. That's a phrase that our production has shown is obsolete because it's not there.

So what was produced in *Tong* were the formal resources and the informal resources, and those informal resources were the types of documents that referenced a "water initiative" for the time frame that that phrase was being used. We have produced formal resources and informal resources. So, if that phrase was still in use, it would have been reflected in those resources. So what we've provided are the operation guides, the standard claim processes, the job --

THE COURT: Can I just --

MS. HOFFMAN: -- formal resources --

THE COURT: Can I just stop you there?

MS. HOFFMAN: Uh-huh.

THE COURT: When you were saying "formal resources" and "informal resources," are you referring to whether or not the document uses the term "water initiative" or -- what's the difference between "formal" and "informal"?

MS. HOFFMAN: I'm saying that -- the difference

between "formal" and "informal" is "formal" would be, like, an operation guide.

THE COURT: Okay.

MS. HOFFMAN: So that's an enterprise-wide document that's gone through significant vetting and is published for the company to use as a resource.

THE COURT: Okay.

MS. HOFFMAN: I'm saying "informal" is more of an ad hoc, a local -- a presentation, a PowerPoint made and given --

THE COURT: Got it.

MS. HOFFMAN: -- to team managers in a certain area. So we have not -- what we -- the issue in *Tong*, too, Your Honor, if I can back up.

THE COURT: Yeah.

MS. HOFFMAN: *Tong* was briefed -- and I think Your Honor is aware. They have very different procedural posture. *Tong* had no documents produced at the time that the court was considering the issues because there was no protective order that had been entered. So the court issued an order on the protective order the same day it issued an order on this. So there was nothing for the court to look to say whether or not the documents sought were relevant. There was nothing for the court to look to say whether or not there was an water initiative in effect -- or, quote, "water

initiative" in effect at that point in time because there was nothing produced.

Here, before this motion was even filed, we've produced over 5,000 pages of documents in this case. We've produced many formal and informal resources, those kinds of resources where, if the phrase "water initiative" was being used, you would see it, and that includes a document called a "Fire Quality Plan" that sets out across the enterprise what the areas of focus are going to be and for a particular time. That phrase isn't in there. So what we've given them is what is relevant in this time frame. We've given them the things in effect at the time of the loss and dating back two years before that.

THE COURT: So sorry. The documents at the time of the loss and two years back?

MS. HOFFMAN: Yes.

THE COURT: Okay. And I totally appreciate *Tong* is not binding on the Court. It's not binding on you. You're free to relitigate issues that were presented. There a different factual scenario, and there's no legal -- it's not -- it's only persuasive authority, but just put that all aside. Is the only difference between what you’ve produced for Category 1 in this case, as you were ordered to produce in *Tong*, is the time limits? I think in *Tong* it went back further. Are you producing the same documents that were

ordered produced in *Tong* but just for --

MS. HOFFMAN: That's my understanding, Your Honor.

THE COURT: Okay. So you're going back two years. I think *Tong* said ten years -- or whatever the -- before the start of the alleged water initiative; yes?

MS. HOFFMAN: Yes. We've gone back two years for formal and informal resources --

THE COURT: Just talking about Category 1. Okay. Okay. All right. That's helpful.

Mr. Schaffer, do you want -- just on the question of what's been produced here and how it relates to the order in *Tong*, can you just clarify the record --

MR. SCHAFFER: Gladly. And I appreciate your hearing us today, Your Honor.

And there's no question that every time we brief these issues -- and we have done repeatedly now -- it's always a challenge to bring the Court to where counsel are because we've been doing this for ten years so, you know --

THE COURT: Yeah. I appreciate that.

MR. SCHAFFER: And if the -- you know, if the briefing wasn't complete, that is entirely my bad. It's my burden, and so I did my best. And I think -- my focus was more on the declaration than in the briefing, but fair enough.

So let me be very, just, directly responsive to

Ms. Hoffman's comments. The answer to your question, Your Honor, is "nothing." That's the answer. The answer to whether they have produced a single document responsive to Requests 18 and 24 to 43 is "nothing." And it's quite easy to see that if you look at their responses because --

THE COURT: Well, let me just --

MR. SCHAFFER: Yeah.

THE COURT: -- stop you there. In *Tong* you won a court order entitling you to these documents. Did you get documents in *Tong*?

MR. SCHAFFER: No. Because what happened in *Tong* was, after the order came in, there was a long period of delay.

THE COURT: Right.

MR. SCHAFFER: We then litigated a post-order motion --

THE COURT: I'm aware of that.

MR. SCHAFFER: -- which the court said, "Give me 30 days," and the case resolved.

Also, Your Honor, I think you probably are aware that, when we get documents in these cases, we're obligated to get rid of them. So what we have is work product which generally describes categories and Bates ranges which we use, but I can't show Your Honor the documents from *Tong*. But the answer to your question is that we didn't get any of the

initiative documents.

And let me be very clear. At the time of *Tong*, we were using the phrase "water initiative" to describe -- in capital "W" "I." If you look at the definitions, it's -- in our request in this case, we don't do that because obviously what we're talking about is not something called the "water initiative" but programs, schemes, plans that State Farm put in place around 2016, which it has kept in place to today, which we've described in exhaustive detail in our briefing and reply briefing, and I can -- I'm perfectly happy to go through the --

THE COURT: Okay. But the operation guidelines, standard claim processes -- all of those -- those are not -- those are not things that were put into place in 2016?

MR. SCHAFFER: Correct. So every time we have this conversation with Your Honor -- and I think this is number three -- Ms. Hoffman does the same thing, which is that she conflates Category 4, which is training and guidelines, which --

THE COURT: Yes.

MR. SCHAFFER: -- Your Honor put the requests in, and I won't talk about --

THE COURT: Yeah.

MR. SCHAFFER: -- Request 3, but you've got the requests there --

THE COURT: Yeah.

MR. SCHAFFER: -- and Categories 1 through 3, which are essentially the same thing because the programs -- I wouldn't use the "I" word, I won't say "initiative" anymore. The programs were essentially one thing, and what they were was a program to reduce indemnity and claims expenses across claims -- the United States, and largely it was focused on wind and hail claims and water claims in California. So you basically have one which really has subheadings. You have water initiative documents, documents describing the programs --

THE COURT: Right.

MR. SCHAFFER: -- and then the (indecipherable) documents -- the communications, the metrics -- and then the coaching documents, and they're all really one thing and the --

THE COURT: Right.

MR. SCHAFFER: -- look at the requests, those three categories --

THE COURT: Yeah.

MR. SCHAFFER: -- if you look at the requests to those and the responses, there isn't a single response which says anything other than "no." It simply says "no." If they were going to produce documents actually responsive to those requests, they would have said so and they --

THE COURT: Well, let me ask you, Mr. Schaffer. So you've litigated these issues in a number of cases. Do you -- in your other prior litigation, have you received documents responsive to Category 1 -- your Category 1 requests?

MR. SCHAFFER: The answer to that question is no.

THE COURT: Okay.

MR. SCHAFFER: Now, what I can tell you is --

THE COURT: So then I think the question is -- well, I -- we can hear from Ms. Hoffman, but they may not think those documents exist.

MR. SCHAFFER: Well -- so I have put in front of Your Honor --

THE COURT: Yeah.

MR. SCHAFFER: -- de-designated documents from Oklahoma which plainly show these programs. I mean, there's not a serious dispute now because so much of this is in the public record. So we know exactly what they did. They --

THE COURT: The Oklahoma documents show a water loss program --

MR. SCHAFFER: Correct.

THE COURT: -- initiative --

MR. SCHAFFER: And all of this is -- is I think -- this part of my briefing I am -- I stand behind --

THE COURT: Okay.

MR. SCHAFFER: -- and I do believe that. And then in our reply brief because Your Honor asked State Farm to go to those lawyers and find out what these documents are and what the scope is and whether they're relevant here, and they didn't do that. I did. So I got a declaration from our expert, who's also the expert in Oklahoma, who has read these documents, who provided a detailed description of the programs, the way they relate to water losses.

And let me be very concrete about this because I do think it's important for me to say what I believe to be the case and I believe we can prove if given access to the documents. We will prove that State Farm intentionally drove up the amount of denials of slab and water losses in California from the period two thousand -- really, it's 2016 to today intentionally, on purpose, deliberately, and we can prove it. And the documents I've already given Your Honor pretty much show that, and the declaration from Mr. Romano is very clear on this point. The documents that he's seen demonstrate that State Farm implemented a program to drive up water-loss denials in California.

THE COURT: Okay. Let me just stop you.

MR. SCHAFFER: Sure.

THE COURT: So, Mr. Hoffman, have you reviewed the Oklahoma documents that Mr. Schaffer is referring to?

MS. HOFFMAN: I've reviewed what he submitted,

Your Honor --

THE COURT: Okay.

MS. HOFFMAN: -- and I don't see anything in there that would suggest what he's claiming and we even -- I would refer the Court to our declaration from Nicole Manduca, who is a party to that document that he submitted, who addresses these issues.

We absolutely dispute these characterizations, and what I haven't heard is any mention of the Myles. I haven't heard how any of these claims connect to this claim or how there's any documents that would support what he's actually saying. What we have offered show that these things don't exist. There is no initiative to deny covered claims, and there certainly wasn't even that phrase used in the relevant time frame. And I'll add, Your Honor, we even did an email archive search for the claims personnel involved for the phrase "water initiative," and we got no hits. There is no such initiative in this time frame, and the fact that they don't have anything reflecting that phrase shows that. They're --

THE COURT: Okay. I guess --

MS. HOFFMAN: -- asking us --

THE COURT: What I'm still struggling with here is I think the -- you can -- parties can disagree about what they want to call it. There's some change in State Farm's

policies, procedures in 2016?

MR. SCHAFFER: Your Honor, let me --

MS. HOFFMAN: No. I --

MR. SCHAFFER: Let me be very --

THE COURT: Let me ask Ms. Hoffman --

MR. SCHAFFER: Sure.

THE COURT: Do you disagree with that?

MS. HOFFMAN: I disagree that there's any fundamental change in policy. I -- what State Farm's position is, is that they are always looking to improve quality claim handling on claims, and as times change, as management changes, things -- phrases change. So that phrase "water initiative" was in use years ago, around 2016, 2017, I believe. I can't give --

THE COURT: Okay.

MS. HOFFMAN: -- an exact date, but that's not something that's in use, and there's never -- never -- been any documented effort to deny covered claims. Plaintiff's own expert has said that. We have no documents of that, and no matter how much we search, we're not going to find that.

THE COURT: Right.

MS. HOFFMAN: We have provided the formal --

THE COURT: Well, let me ask just you --

MS. HOFFMAN: -- informal and --

THE COURT: Let me just ask you: If we put aside

terminology and what it may or may not show, State Farm has policies for processing water-loss claims. Yes?

MS. HOFFMAN: Yes.

THE COURT: And I take it you --

MS. HOFFMAN: And we've produced those documents.

THE COURT: You've produced those for the narrowed time frame?

MS. HOFFMAN: Yes.

THE COURT: Right?

Mr. Schaffer?

MR. SCHAFFER: Yeah.

THE COURT: If we expand the time frame to cover 2016, does that get you -- because I want to -- I feel like we're -- the terminology doesn't matter here, just what the documents are.

MR. SCHAFFER: So, Your Honor, it is essential that we listen to Ms. Hoffman's words. What she told you was that there's no program to "deny covered losses." Think about that. What she's telling you is she's got declarations from senior managers that says, "We don't deny covered losses." Of course they think they don't deny covered losses. And if you look at pages 17 to 21 of our brief and you look at Mr. Romano's declaration, Mr. Romano has seen the Oklahoma documents -- all of them. He says (reading): California water initiatives focused on coverage, namely, reducing the

number of paid claims in various ways. He says (reading): I can say the initiatives relating to California water coverage resulted in large percentage increases in denied claims.

They are going to tell you that all of those denied claims were not covered, of course that's their position, but that's (indecipherable) dispute.

And Ms. Hoffman constantly is referring to "resources." Those are training documents. Those have nothing to do with high-level, executive and consultant-driven programs. Which the idea that a lawyer can get up now and say that these programs do not exist is -- we're into Kafka land. Because in my briefing and in our declarations, we point the Court to actual documents which reflect a program to increase frequency errors. What is a "frequency error"? A "frequency error" is an analysis -- an AI analysis of denied claims or of covered claims where they say, "You got these right. You got these wrong. We're going to drive down frequency errors." It's a plan, Your Honor. It's plainly documented. We have detailed descriptions of these programs, and they have nothing to do with operations guides or resources or training documents. These are documents which reflect a scheme by State Farm to dramatically decrease covered water losses in California starting in 2016 and continuing today.

THE COURT: Okay.

Ms. Hoffman?

MS. HOFFMAN: Your Honor -- yeah, if I may add, now, the expert that he's referring to is an extensive speculative declaration that was offered on reply that we had not had an opportunity to respond to and we objected to. This person I don't know has any involvement in California and water-loss claims. He's a Florida insurance adjustor. I'm not familiar with him.

But I want to go back to what is specifically alleged in this case because the pleadings frame the issues, and plaintiffs allege at paragraph 36 that State Farm has been for at least ten years engaged in an intentional institutional and unlawful pattern and practice of failing to competently investigate water losses and unreasonably and maliciously denying water loss claims it knows to be covered. That is what is alleged.

We have produced -- and I will go back -- and for some reason -- I'm not sure why this is, but a number of the exhibits to Mr. Schaffer's declaration in support of the motion have very funny formatting. I'm not sure what happened to the documents, but in looking at them, the Court can see we have referred to the training transcripts for the claim specialist and the team manager who worked on the claim that lists all of the training they took.

THE COURT: Right.

MS. HOFFMAN: We've produced the water-loss training related to their training. If plaintiffs thought there was a training that hasn't been produced that's relevant, they have not told us, but they have the whole list of training they received.

THE COURT: Right.

MS. HOFFMAN: We've produced the operation guide, standard claim processes, and jurisdictional references. Those are the "formal" resources I referred to. And we've also produced responsive training and resource materials in effect through the filing of the suit, and what those are, are resources that are presented or available to claim specialists and team managers as they're handling water-loss claims. It's what guidance they're given. So, if there's anything in there that's improper or wrongful, that's what Mr. Schaffer has, he can argue about it, but we haven't seen that before the Judge because that's not -- there's nothing in there that supports these allegations.

MR. SCHAFFER: She's a hundred percent correct, Your Honor. Because it has nothing to do with what we're asking for. It has nothing to do -- what the *Tong* order says, it has nothing to do with the *Savas* order, and it has nothing to do with the Oklahoma orders because they're talking about programs to drive up profits. It has nothing -- why would they put in a training document: "Make sure that

when you see these kinds of things here" -- those are training documents. Senior executives over ten years, consultant-driven programs to drive up denials, to drive down claims expenses, and to drive down indemnity.

And this is carefully documented in our briefing, and Mr. Romano's declaration was occasioned by the fact that Your Honor ordered Ms. Hoffman to go talk to the Oklahoma lawyers and find out the scope and relevance of those documents here, and she didn't do it, and the reason she didn't do it, Your Honor, is because, if she did it, the Oklahoma documents -- all they have to do is press "send," there's no burden whatsoever, and those documents bear heavily on the allegations here. The allegations are exactly as Ms. Hoffman described them. State Farm --

THE COURT: Okay. Let me --

MR. SCHAFFER: Yeah.

THE COURT: Let me just tell the parties how I see this at least at a thousand-foot view. There's an allegation that there's some change in State Farm's policy in 2016 that could be characterized as a "refinement" or "implementation" of existing policy, as Ms. Hoffman is sort of suggesting. It could be a new program that is intended to, you know, enrich the company at the hands of its clients, as Mr. Schaffer is suggesting. I don't know that I need or could determine that on what's presented to me, but I do think that plaintiffs are

entitled to some discovery into whether in fact there was some change in policy in around 2016, and that's what I understand the *Tong* order to say.

So I am -- I'm inclined to follow *Tong* because I think it is helpful, clear, and, to me, seems broadly correct. It's also true that two judges, I believe, on this court have agreed with it.

I know, Ms. Hoffman, you did appeal to the district court judge, who in large part agreed with Judge Rocconi's rulings there.

So what I would like to understand: Ms. Hoffman, if you had to have complied with *Tong*, what additional documents would you have produced there beyond what you've produced here in this case today?

MS. HOFFMAN: Your Honor --

THE COURT: Yes?

MS. HOFFMAN: -- and I want to talk about burden because that's also something that was not addressed in *Tong*.

THE COURT: Okay.

MS. HOFFMAN: So what I --

(Background conversation.)

MS. HOFFMAN: What I've gone over is we have produced training --

(Background conversation.)

MS. HOFFMAN: -- we have produced resources --

(Background conversation.)

MS. HOFFMAN: -- formal --

THE COURT: Right.

MS. HOFFMAN: -- and informal. Given the breadth of the requests and the documents involved, my --

THE COURT: Right.

MS. HOFFMAN: -- my team alone has spent over 180 hours getting these documents together and produced -- over 5,000 pages -- and that's for two years back. It's over a month of work. They're asking for ten years, Your Honor.

THE COURT: Right.

MR. SCHAFFER: So the extent of burden would be massive to go back and do that same diligence and investigation for this case. To pull together the formal and informal resources dating back to 2016, it would be an extensive burden, and if that's now what's at issue -- so before it was hundreds of thousands of pages. That's what he briefed, and that's what we offered a burden declaration on, and I would ask for the ability to offer additional, more focused evidence about burden, if that's what we're being asked to do here, because ten years of documents is an extensive amount of documents when you're dealing with a --

THE COURT: Well, let me ask, I guess, both parties.

If these alleged changes happened in 2016,

Mr. Schaffer, why isn't it sufficient just to get documentation of these alleged changes in and around the time they occurred?

MR. SCHAFFER: Because the program started -- I mean, the truth is, is that, because I have never seen the documents, there's a limit to what I can say.

THE COURT: Sure.

MR. SCHAFFER: What I can say is that I've talked extensively to the lawyers in Oklahoma, extensively to Mr. Romano, who is very much a California expert, and, you know, the answer is that these programs were -- actually, the heart of them was 2020 to 2024, and we have -- you know, his declaration says that -- up to and through 2024, which is essentially the period of time of this claim -- it's mid-2025 -- or late 2025 -- you have programs that are driving up California denials in water losses.

So -- but let's talk about burden for a second. So first of all, they offered no declaration from anybody other than a outside third party on a claim that -- on a case that involved something like 16 million pages -- or 16 million documents. I couldn't make heads or tails of it myself, but they don't have any other declaration.

But here's the more important point: The Court told Ms. Hoffman to do something, and that something was -- in my opinion, was extremely smart, which was let's figure out what

happened in Oklahoma because maybe there's a simple way to answer this question -- or respond, and there is. Here's what she needs to do: Send. That's the burden. Because if they produce -- or they don't even need to produce. If they make accessible to us, pursuant to the terms of the protective order in this case, the same scope of documents that were produced in Oklahoma, we're certainly very, very far along, and then I get to take some depositions, and I say, "Okay. We can talk to them about this," and "Was this continuing?"

That's the answer, Your Honor. There's no burden at all. The documents exist, they're owned and operated by lawyers in Oklahoma, and we know, because of Mr. Romano's declaration and because the documents that were de-designated, that they all -- all -- every time they talk about wind and hail, they talk about water. It's the -- they were parallel programs. So --

THE COURT: Yeah. I'm just -- I'm not sure I -- I'm not sure I see these two lawsuits as comparable. This is a single homeowner or --

MR. SCHAFFER: So --

THE COURT: -- owners.

MR. SCHAFFER: Your Honor, those are single-homeowner cases. They're two cases involving -- in fact the losses are far smaller. These are $30,000 roof losses. Each

case is a separate, standalone insurance bad-faith case, and the courts there -- they made all of these arguments, as you would expect they would -- burden, relevance, proportionality -- and they lost, and the reason they lost is because this is highly relevant to our allegation that this is an institutional pattern to drive up water losses -- water denials and our clients got caught up in that program.

So, if we can do this in a way that allows us to look at the documents in Oklahoma, that allows -- Ms. Hoffman's burden argument disappears, I don't know why we wouldn't take that road. Assuming that the -- that we're past the, you know, we don't get anything, which is what they've said for, now, seven months.

THE COURT: Ms. Hoffman, go ahead.

MS. HOFFMAN: That’s incorrect, Your Honor.

THE COURT: Yeah. Go ahead.

MS. HOFFMAN: Thank you.

That's incorrect. And if I can submit, you know, I think we've veered far off of the scope that Your Honor wanted to address in this case, which is the actual verbiage of the requests served in this case.

THE COURT: Yeah.

MS. HOFFMAN: But I want to go back. You know, I would agree with Your Honor that wind-hail claims in Oklahoma have no connection to the Myles claim here.

And I want to also add that plaintiffs have tried to get at this kind of allegation in different ways. They've made document requests, and they've now made interrogatory requests that are going to be the subject of the IDC, and maybe it, perhaps, makes sense to talk about that as well here. They're looking for data about paid claims and paid -- and claims that have been closed without payment and we -- you know, we can address that later. They've asked for information in a way that can't be provided, in large part, without a claim-by-claim review, but there is some data that can be --

THE COURT: For the interrogatories you're talking about?

MS. HOFFMAN: -- claim by --

THE COURT: Yeah.

MS. HOFFMAN: -- claim review.

So I think, you know, looking at time frames from that perspective would be less burdensome than having to go back for ten years and go to custodians and pull documents ten years back as things are updated. You know, the standard claims processes are updated quarterly. The amount of paper -- to what end -- that will be required having to go back ten years has not -- that -- the relevance and the proportionality, we would submit, have not been supported here on this record, and there are --

MR. SCHAFFER: Your Honor, may --

MS. HOFFMAN: -- different ways of going about looking and testing whether theories have any basis.

MR. SCHAFFER: Can I make one point just about *Tong*?

THE COURT: Yes.

MR. SCHAFFER: So the *Tong* order includes the period, not just 2016. It includes the period from 2016 to the date of the requests so -- and, again, Ms. Hoffman, repeatedly refers to operation guides and standard claim processes, and I don't want any of that. I already have it, I don't need it, and it doesn't say anything. I'm talking about a different universe of documents, and it is the universe of documents we sought and received an order to produce in *Tong*. It is the universe of documents that they sought and received orders to produce in *Savas* and in the two Oklahoma cases. That is the universe of documents we're talking about.

THE COURT: So describe for me with particularity what those documents are.

MR. SCHAFFER: Sure. To the extent I can do without -- without violating -- well, actually, I should say this: To the extent I can do because I can't look at the Oklahoma documents. What I can do is look at the de-designated documents, and I can look at -- I can talk to

their expert, who gave, I think, an extensive declaration describing the documents.

So here's what we're talking about: We're talking about basically communications, PowerPoints, you know, executive-level discussions about the programs: How do we do this? We have consulting reports. Consultants both internal and external came to State Farm and said, "Here's how you do this, and you do it by implementing programs, various" -- and again, all of this is in the papers -- the very specific things. They steer claims to particular teams. They do what they call "reinspections," which are essentially AI review of paid claims to determine whether claims -- basically paid claims are being -- "We're paying too many claims," "We're paying too much for claims," and --

THE COURT: Sorry. AI -- what do you -- in 2016 what are the documents you're seeking?

MR. SCHAFFER: So again, it's not just -- I mean, I haven't seen --

THE COURT: No. I understand. What -- show me -- tell me what you think you're going to find --

MR. SCHAFFER: Yeah.

THE COURT: -- in 2016.

MR. SCHAFFER: Documents reflecting the following program --

THE COURT: Yes.

MR. SCHAFFER: -- "California water losses are being overpaid. We're paying too much, and we're paying too much to investigate them." So communications among senior executives and PowerPoints and consultant reports, all of which were ordered to be produced in *Tong*, which describe a multifaceted program --

THE COURT: Right.

MR. SCHAFFER: -- in which State Farm sought to drive up -- drive down indemnity and drive down claims costs --

THE COURT: Right.

MR. SCHAFFER: -- by the following: a -- a program of -- what they call "reinspection," which has nothing to do with inspecting homes but has to do with taking paid claims, feeding them into a review -- an AI system, and describing -- using various elements -- which we don't know because we haven't seen the documents -- and then coming up with a frequency error, meaning "Here are certain adjustors or team leaders or section leaders who are paying too much. They're making errors. We're going to drive down those error rates by way of coaching."

THE COURT: Yeah. Yeah.

MR. SCHAFFER: Likewise, they were -- one of the ways they drove down -- or drove up denials severely was by directing claims to particular teams. So they would create

teams to handle these losses, and then the denials would go up, and the indemnity would go down. So there are -- and again, all of this is in the briefing, where we describe with specificity the specific tools that State Farm used. And then, of course, they religiously tracked -- set metrics, set goals, and tracked those. And the improvements, the quality, the accuracy was always unidirectional. "Improvements" at State Farm means "making money" -- always.

THE COURT: Uh-huh.

MR. SCHAFFER: So I cannot and I don't think it makes sense to spend the Court's time here going through element by element because it's in the papers. I mean, that I -- again, I think we briefed properly.

And that is precisely what the *Tong* order directed us to get, but it's absolutely true -- Ms. Hoffman's point is absolutely correct that in *Tong* we didn't know as much. So the specificity of the requests, the specificity of the order was -- it was at a much higher level. She just said, "Give them the initiative documents. Give them the consulting documents. Give them the communications." What she couldn't do was to -- and we couldn't do because we didn't have the information at that time. We didn't really understand the specificity -- the specifics of the programs at that time, but now we do; so that's what's in the requests.

THE COURT: And if I understand, the relevance here

is because for a bad-faith claim you have to show not only was it covered by the policy but there was some ulterior motive here. So you're going to show that they did this because they had these programs to drive down --

MR. SCHAFFER: Your Honor, we -- in our briefing --

THE COURT: Yeah.

MR. SCHAFFER: -- we cited three cases, which all essentially say the same thing --

THE COURT: Yeah.

MR. SCHAFFER: -- in an insurance bad-faith case where you have a single denial, you get to show malice and unreasonableness based on institutional conduct. That's --

THE COURT: Yeah.

MR. SCHAFFER: -- you know, that's -- at the heart of our claim here is that these folks -- and let me actually take a step back.

I -- my office is three lawyers. In three years we had three cases which are the same, unmistakably the same: State Farm got a call about a water loss, State Farm never saw the loss, never figured out the duration, did no investigation, and denied the claim. Now, why? Why are we seeing the same conduct in this case as we're seeing back three or four years? It's the same identical conduct. They don't know anything, they deny the claims without any basis, and they wait to get sued. It's a pattern which they put in

place, which we can prove and which will demonstrate that this conduct --

THE COURT: So, if they're denying claims without any basis, isn't that enough to show bad faith?

MR. SCHAFFER: A hundred percent. The question is whether it's enough to show malice, whether it's enough to show an entitlement to punitive damages.

And, you know, in the Myles case, they're now doing claims adjusting, you know, a couple of months ago, where now they have new evidence. So they're going to come in, and they're going to say, "This claim was never covered. Maybe we didn't do enough of investigation." But if I can show a jury that this is conduct that is across hundreds, and perhaps thousands, of claims, that they've saved tens, maybe hundreds, of millions of dollars by driving -- by intentionally driving up the percentage of denials of water-loss claims in California, that is the essence of a punitive damages claim.

THE COURT: So to humor me -- this is what I think Ms. Hoffman was getting at earlier, but what's the difference between that and every other company that tries to make as much money as possible?

MR. SCHAFFER: Well, a number of things. First of all, they hid it. So they're obligated -- if they're going to, essentially, reduce coverage, they're obligated to tell

their customers that and tell the regulators that, but the reason that there -- now there are attorney general investigations in five states on these issues is because they never told anybody about this, this was hidden, and secrecy is an essential part of this. That's number one.

Number two is the policies are drafted in a way that is extremely kind of broad and ambiguous. So they -- here they have an exclusion for "continuous and repeated seepage and leakage of water." Nobody has any idea what that means. So what they do is they coach to this, and they essentially drive down the scope of coverage secretly at an executive level without sharing it with the world. So State Farm's sort of, you know, "good neighbor" brand was going to be -- you know, have some issues if they started to say, "Well, actually these commercials where we're showing coverage for water losses are not true because we're dramatically impacting the scope of coverage."

THE COURT: Okay.

MS. HOFFMAN: Your Honor?

THE COURT: Thank you for humoring me.

Ms. Hoffman, you don't need to respond. I just wanted to understand better how this fits in.

Unfortunately, I don't know that we're making any progress here, at least as to Category 1. Why don't we move on and then discuss --

MS. HOFFMAN: Your Honor?

THE COURT: -- Category 4.

Yeah, go ahead, Ms. Hoffman.

MS. HOFFMAN: If I may.

THE COURT: Yeah.

MS. HOFFMAN: I want to just go back. Your Honor asked a very simple question, "What are you looking for?" and Mr. Schaffer just spoke for about ten minutes.

THE COURT: Yeah.

MS. HOFFMAN: How can we have notice of what we are supposed to be producing if Mr. Schaffer can't say what he's looking for? So I would submit, Your Honor, he has not yet deposed the claims people involved in this. We have offered to produce Ms. Manduca for deposition, who's the one who authored the only document that he's pointed to. He hasn't questioned anybody about this and what they were told and what they -- how they were trained. Now, we do know from them that they were never told to deny covered claims because that's what they stated in their declarations here, and they'll testify to the same thing in their depositions. And we do know what they -- what training they received and what resources they had because we produced 5,000 pages of that.

And to be clear, there were, after the order in *Tong*, more than 4,000 pages of documents were produced, and that's noted in another order in *Tong*, but there were also

additional orders that narrowed the requests -- the production required and that sought clarification because just as Mr. Schaffer can't articulate here what he's looking for, he couldn't do it there. And to issue an order based on a ten-minute argument and speculation of counsel would fail to provide us with any notice of how we can even possibly comply with it.

MR. SCHAFFER: Your Honor, the reply --

THE COURT: Well, I --

MR. SCHAFFER: Let me just -- because -- I have to because you're not wrong that I spoke for ten minutes.

The answer is in the requests. I mean, they have refused to answer -- or provide documents responsive to 18, which has to do with consulting; and 24 to 43, which very specifically identify the categories of documents for issue. I -- if you would like me to go through those, I’m happy to do it. I doubt you want to go through that exercise. So I -- and they know how to produce the documents because they produced the identical categories of documents in Oklahoma.

THE COURT: Okay. Let's move on to Category 4, the policy and training documents.

Mr. Schaffer, what is it that you're seeking beyond which -- I took it in your reply you're just asking for a verification that they're -- produced everything that's responsive?

MR. SCHAFFER: So the answer is we don't have a single response that says, "We're" -- "We've searched for and we're producing the documents," and we -- and until we get an order that tells State Farm to do that, we're never going to get that. I mean, we have an email on September 11, in the middle of the briefing here, that says -- or after the briefing that says, "We're going to look for and produce documents." So --

THE COURT: Right. But they have produced some documents, I think --

MR. SCHAFFER: They -- Your Honor, they always -- this is -- I’m sorry. They haven't --

THE COURT: No. Mr. Schaffer?

MR. SCHAFFER: -- produced documents.

THE COURT: Just -- have they produced documents responsive to these requests?

MR. SCHAFFER: Absolutely. Absolutely.

THE COURT: Yes.

MR. SCHAFFER: The question --

THE COURT: So I took it from your reply that --

MR. SCHAFFER: Yeah.

THE COURT: -- you just want a clear answer that they're done producing their responsive documents?

MR. SCHAFFER: I would like a code-compliant response which says, "We searched for and produced responsive

documents," without reference --

THE COURT: Okay.

MR. SCHAFFER: -- relevance --

THE COURT: Ms. Hoffman, are you prepared to do that, or are you still in the process of producing responsive documents?

MS. HOFFMAN: We are still in the process. We have identified a handful of additional resources --

THE COURT: Okay.

MS. HOFFMAN: -- and once those have been produced, like we said in our responses, we would supplement to confirm the production was complete.

THE COURT: Okay. And when do you anticipate that happening?

MS. HOFFMAN: In the next few weeks, Your Honor.

THE COURT: In the next few weeks. So, if we set a deadline a month out from now, is that sufficient?

MS. HOFFMAN: Yes, Your Honor.

THE COURT: Okay. And then I think -- I assume you have no problem with the language that Mr. Schaffer is discussing here, which is just your standard discovery response that you've completed your search for responsive documents and produced everything responsive. Yes?

MS. HOFFMAN: Yes. Yes.

THE COURT: Okay.

MR. SCHAFFER: Your Honor, I'm going to hazard to add two -- there's essentially two requests in the third set which are very much within this scope, but we identified with specificity in the third request. It doesn't expand the requests. It just -- there's two particular documents that are -- could not possibly be more relevant here, which we haven't seen, which they've told us we don't get because they're not relevant. So this is my concern is that every time -- if they -- if I ask for a broad set of documents and I don't get documents I know exist and are highly relevant, then I have to go through this process again.

So can we -- I would appreciate Your Honor ordering State Farm to include in its production our Requests 106 and 108, which are for documents directly bearing on foundation coverage in California.

THE COURT: I'm not going to address the RFP three -- set three, but, you know, Ms. Hoffman's heard you. I would certainly not (indecipherable) back here on these issues again if it's really a subset of documents that are already in set two or set one.

MR. SCHAFFER: Thank --

THE COURT: All right. Let's move on to Category 3. These are, I think, as far as I can tell, the personnel records for the people involved and up the chain from the people who handled the claim at issue here; is that correct,

Mr. Schaffer?

MR. SCHAFFER: Yes. And also documents relating to goals and metrics and so forth. Yes.

THE COURT: Okay. But the -- I understood Category 2 to be the goals and metrics.

MR. SCHAFFER: So we have two sets of goals and metrics. We have executive level setting of goals and metrics as relates to the programs, and then what we have is documents relating to goals and metrics for personnel. So, for instance --

THE COURT: Okay.

MR. SCHAFFER: -- those frequency errors that I was describing earlier --

THE COURT: Yeah.

MR. SCHAFFER: -- those didn't make their way down to levels one and two of claim staff. Those are at the --

THE COURT: Yes.

MR. SCHAFFER: -- claims level and the section level, and so what we're trying to find out is how did these programs actually get implemented at the four levels of claim staff?

THE COURT: Okay. Okay. So I understand, Ms. Hoffman, you've produced for the -- is it the two people at kind of the bottom of the chain here that -- is it -- is this Robin Dixon (phonetic) and Ellen Redman (phonetic)?

Those two people?

MS. HOFFMAN: Yes. Robin Dixon is the claims specialist assigned, and Ellen Redman was the --

THE COURT: Right.

MS. HOFFMAN: -- team manager.

THE COURT: Okay. So that's like level one, level two?

MS. HOFFMAN: Yes.

THE COURT: And, Mr. Schaffer, you want level three and level four?

MR. SCHAFFER: Correct.

THE COURT: Okay.

MS. HOFFMAN: And, Your Honor, if I may, that was not ordered in *Tong*.

THE COURT: No. I know --

MS. HOFFMAN: -- *Tong*.

THE COURT: Ms. -- well, since it's your burden, Mr. Schaffer, explain to me why you need to go that far up the chain here.

MR. SCHAFFER: Sure. Because that's exactly what State Farm did. They understood that lawyers like me are going to get the claims personnel, the first and second level, because those are the people who always show up in the claim file. So the section manager and the claims manager are never going to show up in the claim file but those -- if

you look at the Oklahoma declaration, what Mr. Romano says is "Yeah, essentially what they did was they" -- the management -- the frequency errors were as relates to those first two levels, never as relates to the second two, and they were focused primarily on claims. So what they did was they would coach inside claims, and of course I'm not going to get the claims files for, you know, 5,000 water-loss claims.

So, I mean, secrecy was an essential element of this -- of these programs, as Mr. Romano has alleged, and so, yeah, they absolutely coached to those first two levels, both with metrics and goals and then actual personnel records, without -- and then the rest of the coaching was done inside claims and orally so you don't see -- you don't see the -- you know, the line directly from the senior staff to the --

THE COURT: These are -- levels three and four are coaching levels one and two on how --

MR. SCHAFFER: Correct.

THE COURT: -- to deny water --

MR. SCHAFFER: Correct.

THE COURT: Yes? Okay.

MR. SCHAFFER: And the frequency errors are managed there and not below. So we're not talking about --

THE COURT: Okay.

MR. SCHAFFER: -- claim staff. Yeah.

THE COURT: Got it.

Ms. Hoffman, go ahead.

MS. HOFFMAN: Your Honor, if I may, again, we are continuing --

THE COURT: Yeah.

MS. HOFFMAN: -- to hear argument and speculation of counsel and not evidence to support --

THE COURT: No, no. Go ahead. Tell me --

MS. HOFFMAN: -- proportionality --

THE COURT: Tell me why that's wrong or this is irrelevant and -- yeah. Go ahead.

MS. HOFFMAN: We disagree with that. And I will add that in *Tong* the --

THE COURT: Yeah.

MS. HOFFMAN: -- of course we're objecting to personnel files. In California employees have a right of privacy. We have an obligation to raise that --

THE COURT: Yeah. Let's put that aside. Assume -- let's say we can deal with the privacy issues and these metrics and whatever else we're talking about -- goals and metrics and --

MS. HOFFMAN: I'm well aware --

THE COURT: I think Mr. Schaffer said he has a hunch that at level three and four -- that's where the screws are really getting put in so he wants -- he wants to know what --

MS. HOFFMAN: And I'm unaware of that.

THE COURT: Okay. But -- I understand, but just address that. Go ahead.

MS. HOFFMAN: Sure. I don't know of anything to support that --

THE COURT: Sure.

MS. HOFFMAN: -- but I do know that here we have in the record declarations from the claims people saying, "I spoke with" -- declaration from Robin saying, "I spoke with Ellen," and declaration from Ellen saying, "I spoke with Robin." Those are the folks who made this coverage determination. Those are the folks who -- beyond that, no one was involved in this coverage determination in October 2025.

So in *Tong* the first and second level was ordered to produce the evaluations -- the performance evaluations, and that was after the ruling on the privacy objection. If this Court finds that they don't have a privacy protection in that, then -- if we're following *Tong*, then that's what -- that's the limit. That's what would potentially be relevant here. But we don't see that connection at all, and we would submit they haven't met their burden, but in any event, these employees have an interest in their private employment information.

MR. SCHAFFER: Your Honor --

THE COURT: So, Mr. Schaffer, are you --
MR. SCHAFFER: -- in *Tong* we never --
THE COURT: Are you planning to depose the level one and level two people soon?
MR. SCHAFFER: I mean, we've been trying to depose them for six months, Your Honor. And we've gotten --
THE COURT: Okay.
MR. SCHAFFER: The latest response is that now we can't do it remotely; so now we're here again.
THE COURT: Okay.
MR. SCHAFFER: But let me be clear.
THE COURT: -- talking about.
MR. SCHAFFER: In *Tong* I didn't --
THE COURT: Okay. Well, I will tell you -- I do want to keep things moving here.
MR. SCHAFFER: Yeah.
THE COURT: I don't really see enough here, based on what's in the motion, to indicate that there is something at level three and four that's going to connect to the claims denial here. It's possible. I just don't see anything here to say that there is evidence of it. And you may well get that evidence through that deposition. You're going to ask them. If there are these communications happening, as you say, you know, orally or in some other fashion that's not documented, you'll get that, and then, if you do have

evidence that levels three and four were involved in it, I'm open to reconsidering whether --

MR. SCHAFFER: Well, let me just make sure Your Honor understands my argument. I am not arguing that levels three and four had anything -- any direct involvement in this claim.

THE COURT: Okay.

MR. SCHAFFER: What I'm saying is that the coaching -- these programs were coached to those levels four and three. And the truth is that if I get the documents -- or some percentage of the documents relating to the water initiatives and the metrics and goals, I'm going to be able to prove it with those documents.

THE COURT: Okay.

MR. SCHAFFER: So I would be perfectly happy with an order that restricted it at this time --

THE COURT: I want to be clear. I haven't made a decision on anything.

MR. SCHAFFER: Understood.

THE COURT: My inclination here is that I don't see level three and four, and moreover, I do -- I am in favor of -- when we're talking about document productions of this potential scope, to do some phased discovery, allow you to figure out what you need to figure out, and then, if you need more, come back and get it. But I do hear Ms. Hoffman's

concern here that we're talking about potentially quite extensive discovery. So I don't see at this stage a need to do document requests to those layers above the people who were actually deciding this claim.

MR. SCHAFFER: Your Honor --

THE COURT: Okay. Let's, then, get to, I assume, what will be the other meaty discussion here, which is Category 2, which from my review of it seems to be seeking all kinds of different things at different levels and seeking different things, although I think that it's true they're broadly seeking metrics, goals, and financial outcomes and tracking. Is this really different than the Category 4, Mr. Schaffer?

MR. SCHAFFER: It's completely different, unrelated, different species. So State Farm --

THE COURT: Okay. So explain.

MR. SCHAFFER: As part of its programs, State Farm being State Farm religiously sets goals, tracks outcomes, and produces documents which reflect increases in denials, frequency errors, and does that over -- you know, in written communications and in presentations. So this is really Category 1. 1 and 2 are --

THE COURT: Okay. So let me just ask you -- just to cut to the chase here, you want to be able to say starting in 2016 State Farm has drastically -- or some degree

decreased their denials of water-loss claims. Yes?

MR. SCHAFFER: Sought to decrease it by certain systems, implemented those systems, tracked metrics -- said metric -- their established metrics and goals, tracked those goals, and has outcomes. Yes.

THE COURT: Okay. So it seems to me like there would be ways of getting discovery into that, Ms. Hoffman, that wouldn't necessarily require the sweeping Category 2 documents that I saw here that do seem enterprise-wise, and I think actually an interrogatory may be the most efficient way to get at those, at least as an initial cut. So are you opposed to providing some of these statistics but in interrogatory form? And we can talk about dates and geography and all that, but is that a proposal your clients would consider?

MS. HOFFMAN: Thank you, Your Honor.

And I think that kind of goes to the interrogatories that are at issue in the IDC request --

THE COURT: Yeah.

MS. HOFFMAN: -- which I can address now or later.

THE COURT: If you think it's -- I mean, I’m -- I do -- I put it on the table. So, yeah, to the extent you think it's relevant, sure.

MS. HOFFMAN: Sure. So let me pull up exactly what that's asking. That's asking -- it's trying to get at claims

closed without payment, indemnity paid on claims, and I think that's effectively -- you know, there's a number of other minutiae that they're asking for that cannot be determined beyond a claim-by-claim review, but we can work to identify claims, you know, with a certain cause of loss code made in California for a certain time frame and whether they were closed without payment or if indemnity was paid on those claims. So if that's the kind of information --

THE COURT: And would you be open to doing it from 2016 forward?

MS. HOFFMAN: That can be done from 2016 forward.

THE COURT: So sorry. You're saying -- the geography limited to California, date range 2016 forward, many caveats about you have to -- I understand it's data and it's complicated -- about what translates year to year, but broadly speaking, your clients are open to that kind of discovery?

MS. HOFFMAN: If the Court would order it, I think that would be a far-less burdensome means of obtaining some of this information than having us investigate ten years of documents across an institution.

THE COURT: I don't think doing document discovery for this kind of stuff is particularly efficient, at least as a first go at it.

And if you need, Mr. Schaffer, to then do more

Case 2:26-cv-00452-CAS-MBK Document 78-1 Filed 01/21/26 Page 54 of 88 Page ID #:1678



discovery into where they're getting their interrogatory responses, maybe we can talk about it at that point, but I think it's far more efficient for everyone involved to go that route first. But go ahead, Mr. Schaffer.

MR. SCHAFFER: Your Honor, I -- actually, I think we're, hopefully, making a little progress.

So in our set three, I have two requests, says basically: State the increase or decrease in that California foundation slab they code for this from 2020 to 2026, and then for each quarter state the amount of money you either saved or lost, essentially, right, the change -- related change in indemnity. And I know they can do this because they did it in Oklahoma. There are documents that say that -- my expert says that they -- there are documents reflecting precisely those sorts of measurements. So our request --

THE COURT: But here's the thing -- and, Ms. Hoffman, if I can -- I think Mr. Schaffer is going to need to know more about what your clients are tracking. I don't know if he already knows that or not in terms of what they -- in terms of goals, metrics -- whatever these categories are -- indemnity losses. I'm sure there's a variety of metrics here. So I think you may need to, as a first step here, share some information about what they are able to track that broadly maps on to the categories he's interested in here, and then the parties need to confer.

And, Ms. Hoffman, I'm not -- you're not waiving your objections, necessarily, here, and you can say it would be too burdensome to do X, Y, and Z, but I think a good first step for this kind of data discovery would be a sharing of the universe of categories out there because I'm not going to, obviously, order your clients to invent -- unless -- I -- although I do take it interrogatories may require them to do things they don't already have in existence, but I think broadly --

MS. HOFFMAN: That's correct.

THE COURT: -- they're not going to create new categories. I think you catch my drift.

MS. HOFFMAN: That's correct, Your Honor. And some of the interrogatories ask for more work than others and work that someone else could do with basic numbers that are provided. So we would maintain our objections on those issues to the extent there's extensive work being required to answer an interrogatory, as opposed to producing numbers.

I think -- you know, Your Honor, I want to add -- and again, State Farm is a very large company. There are many departments at the company that look at many different things. So just ordering, you know, tracking or -- that's a -- that in itself is a broad and unspecific ask, and it's really -- I would not know how to respond to anything of that breadth given the extent of the company and the functions

that it has.

THE COURT: Well, let me ask you: Have you been -- have you produced data in other lawsuits with State Farm? Has State Farm produced other data in lawsuits?

MS. HOFFMAN: I am aware of State Farm gathering the kinds of information that we're talking about now with respect to claims closed without payment -- that type of information -- as for an interrogatory --

THE COURT: Okay. So I -- what I expect is that you'll get on the phone with whoever the data people are at State Farm to get a better handle on what the universe is.

Mr. Schaffer, do you have a data expert you expect to retain in this case?

MR. SCHAFFER: Well, we have a claims-handling expert who's also a data expert.

But actually, Your Honor, I would like -- I think that it would make sense to confine the universe of what they can or cannot do to the actual requests because I did in my Requests 10 through -- 10 through 15 I asked for what I need, which is, you know -- and it's there. It's numbers of claims. It's increases in indemnity. It's closed without payments. It's slab losses. So I would be perfectly fine with confining Ms. Hoffman's research to what they can do to produce responses --

THE COURT: Yeah.

MR. SCHAFFER: -- to those requests, not the --

THE COURT: Right.

MR. SCHAFFER: -- whole universe of requests. But if I can get meaningful answers to those requests for the period of, really, 2020 to 2026, that would be -- that would move the ball, I think, forward --

THE COURT: Okay. Okay. Well, all I'm going to order at this point is the parties to meet and confer; Ms. Hoffman, for you to get the appropriate people in State Farm lined up so that you can answer some of these special questions; and then the parties to starting meeting and conferring, and I have a suspicion I'll be seeing you again when you can't agree on what that should be, but I think that would move the ball forward significantly.

And I do say, as I mentioned earlier, my inclination that document requests are not the best way to get at this information. I do appreciate Mr. Schaffer's point that this is relevant here, but I also don't think the kind of burden that would be imposed by these kinds of document requests would be one to make that more general point that State Farm is denying more claims than they used to, which is a fairly straightforward --

MR. SCHAFFER: Your Honor, can I ask a follow-up question? So, as I understand it, what we're talking about here is essentially the second category -- metrics, goals --

that sort of thing.

THE COURT: Category 2.

MR. SCHAFFER: Category No. 2. Okay. Because what I would like to avoid -- because often Ms. Hoffman and I have a dramatically different memory of what actually occurred in these long and fulsome conferences. I would like to avoid a situation where I don't have a ruling on the *Tong* equivalent, which is essentially number one, which is what are the -- what are the programs? I mean, can I use the Oklahoma documents? Do I have access to the documents which actually describe what they were doing in the time frame, as opposed to the data, which I'm actually in certain ways relieved that I don't have to sort through a million pages as it relates to metrics and goals, but I would like to understand or have access to the materials that describe the programs, and I think that was the nature of the *Tong* order, and I think that's the nature of the other orders that have happened, and I think that's appropriate.

THE COURT: Well, I want to circle back to Category 1 once we resolve this, but I'm not confident that you will necessarily, and I want you to start the process of meeting and conferring on this because I do anticipate this will take a while to sort out.

MR. SCHAFFER: Yeah.

THE COURT: Okay.

MR. SCHAFFER: Sure.

THE COURT: So is that -- are both parties clear? I mean, you both, as you do, will request the transcripts of this after so you'll know exactly what was discussed, but I think it's important to get started on that soon.

So, Ms. Hoffman, I'm not going to set deadlines, but please contact your data folks as soon as you can and get the ball rolling here as best you --

MR. SCHAFFER: Your Honor, deadlines are useful.

THE COURT: Okay.

MR. SCHAFFER: Can we --

THE COURT: Okay. Then why don't we --

MR. SCHAFFER: -- some kind of deadline --

THE COURT: We have a lot more on the agenda to talk about. Why don't we circle back and -- this may be the type of case where it might be helpful to set somewhat regular status conferences to keep the ball rolling here and moving forward if there's a bunch of balls up in the air.

MR. SCHAFFER: I would appreciate that.

THE COURT: Okay. So as to Category 1, we haven't made as much progress as I want, and I'm not sure that I understand any better than I came in here today what documents exactly are at issue and how great the burden is, potentially, for State Farm to produce these. So what I would be inclined to do is ask the plaintiffs to file a

supplemental brief that in chart form will lay out following the -- each RFP exactly what documents they can with as much specificity as possible --

MR. SCHAFFER: Yeah.

THE COURT: I know you can't know what you don't know for some of these --

MR. SCHAFFER: Well --

THE COURT: -- but you do know a fair amount.

MR. SCHAFFER: Let me -- I mean, let me make a request, a proposal.

THE COURT: Yes.

MR. SCHAFFER: It is a source of -- as you might imagine -- of immense frustration to me that I know these documents exist, I know exactly the categories, and I know -- but I can't look at them. So, I mean, can State Farm simply allow me access to the Oklahoma documents so that I can come to the Court and really answer Your Honor's question and with great specificity? I mean, what is the downside? There's a protective order there. There's a protective order here. What is the resistance? I'm going to do the work. They don't have to do anything. I will come to Your Honor with very specific Bates ranges, with descriptions of documents. But, I mean, it's a little unfair -- given the rule, which emphasizes access, it's a little unfair for Your Honor to -- or, you know, to -- the burden to be on me to provide

specificity when Ms. Hoffman and her client are the ones who know what's in the materials. But there is a -- there's an answer to this question.

THE COURT: Let me just --

MR. SCHAFFER: Yeah.

THE COURT: -- special thing, Ms. Hoffman, are you open to allowing Ms. -- Mr. Schaffer to review the Oklahoma -- I don't even know. You're not even counsel in that case, are you?

MS. HOFFMAN: No, Your Honor. I'm not licensed in Oklahoma, and I don't understand the connection between the requests in this case -- based on the requirements of burden and relevance and proportionality of this case for that request. And I will add, you know, as Mr. Schaffer mentions -- and I think this is in the record -- he's litigated against State Farm for many years in California. There are other cases where he's received documents that are further back in time and that reference the water initiative. So he's well aware of things that are out there and I -- I'm -- I would not -- I don't have authority to agree to that. I don't see the need for that or the basis to order that.

MR. SCHAFFER: Your Honor, I have --

THE COURT: Okay. So let's just --

MR. SCHAFFER: I have nothing. I have nothing.

THE COURT: Mr. Schaffer, I have no jurisdiction

Case 2:26-cv-00452-CAS-MBK Document 78-1 Filed 11/02/26 Page 59 of 85 Page ID #:1701



over the Oklahoma case. I can't order anything there. State Farm is within their rights, I guess, to decline to allow you to go through those documents, if they so choose, even if it would make everyone's life easier here. I don't -- you know.

MR. SCHAFFER: Your --

THE COURT: So why don't we proceed as I discussed. Prepare the chart. Please with the best of your ability describe with specificity the documents you're seeking. And you already prepared a very detailed declaration, which I appreciate. If you could just add footnotes or cross-reference to where you think you are aware of such documents existing in either litigation or you think they exist in Oklahoma -- whatever it may be.

MR. SCHAFFER: Yeah. And --

THE COURT: Then, Ms. Hoffman, I leave it to you then to prepare as best you can -- I know you want an opportunity to better brief the burden issues involved here. What do you think the best format for doing that is?

MS. HOFFMAN: A response -- a burden declaration is probably going to take a bit of time to pull together once I understand what's being asked for. So I would ask for two weeks to respond to any supplemental brief from Mr. Schaffer.

MR. SCHAFFER: What I --

THE COURT: Mr. --

MR. SCHAFFER: Your Honor, what I think I'll do is I'll obtain a declaration and -- a further declaration from Mr. Romano, who's seen the documents, and he can describe what's there with as much specificity as we think it's going to avoid a motion for sanctions in --

THE COURT: Yeah.

MR. SCHAFFER: -- in Oklahoma.

THE COURT: Right. Okay. That's helpful. So how quickly can you pull together your -- the chart I'm proposing here?

MR. SCHAFFER: A week.

THE COURT: Okay. So we'll set a deadline for October 22nd.

MR. SCHAFFER: Can we have the same deadline with regard to Ms. Hoffman's investigation into the data?

THE COURT: Well, I think she needs your clarification to do her investigation into burden.

MR. SCHAFFER: Not on the data. The data is the --

THE COURT: Oh.

MR. SCHAFFER: -- interrogatory requests. I'm just trying to find -- I'm trying to --

THE COURT: You want Ms. Hoffman to provide information to you on the interrogatories by?

MR. SCHAFFER: In a week.

THE COURT: I think -- here's what I'll propose. I

don't know how much more the two of you want to spend on the phone together, but if you both can -- Ms. Hoffman, if you can do your preliminary investigation by the 22nd.

Mr. Schaffer, share your -- you can file it or share it. I don't care. I'm not going to look at it until I get Ms. Hoffman's response -- this chart with Ms. Hoffman on the 22nd; and then you confer after that.

Ms. Hoffman, you can ask Mr. Schaffer questions about the scope of whatever he's putting in the chart, and you can begin the conversations collectively about what you've learned, Ms. Hoffman, about the database capabilities that State Farm has to produce the information on that --

MR. SCHAFFER: So the order would be that by the 22nd she does her investigation, and then shortly thereafter we meet and confer?

THE COURT: You meet and confer. Where does that put us? The 22nd is next Thursday.

MR. SCHAFFER: I mean, we can meet and confer on Friday.

THE COURT: I don't know what --

MR. SCHAFFER: It's fine with me.

THE COURT: Ms. Hoffman, does that work for you?

MS. HOFFMAN: Next Thursday or Friday, Your Honor?

THE COURT: So you would do your preliminary investigation with your clients --

MS. HOFFMAN: Thursday --

THE COURT: -- by next week, by next Thursday and then have a conversation -- beginning the meet and confer with plaintiff's counsel next Friday on the data question -- the interrogatory/data issues -- okay.

MS. HOFFMAN: Yes, Your Honor.

MR. SCHAFFER: So 10/23?

THE COURT: 10/23 for the meet-and-confer.

MR. SCHAFFER: Very good.

THE COURT: Okay.

MS. HOFFMAN: Your Honor? If I just may --

THE COURT: Yes. Go ahead.

MS. HOFFMAN: -- may raise to the extent -- I don't know that Mr. Schaffer intends to rely on any documents that were produced in this case under "confidential" designation, but I would just ask to ensure that any confidential information referenced in a chart be filed under seal.

MR. SCHAFFER: I don't intend to rely on any documents because I don't have any documents.

MS. HOFFMAN: Okay.

THE COURT: Okay. All right. Then can we move on to the IDC issues now, or was there anything further on the motion that the parties wanted to discuss?

MR. SCHAFFER: No, Your Honor.

THE COURT: Okay.

MR. SCHAFFER: That's fine with us.

THE COURT: Okay. Great. So we can just go through these.

In person. So the dispute over whether these depositions need to be in person or by Zoom.

Ms. Hoffman, can you explain to me your concerns about Zoom -- the position? I know you alluded to some issue with a prior deposition in this case, but it sounds like you were able to successfully do some depositions in the past. So what's your concern for this set of depositions?

MS. HOFFMAN: The concern is preserving the record, and exhibits, and decorum, and especially given the accusations and allegations, to make sure that we have clear record.

And if I may, I believe -- and Ms. Blitz can speak to this as well, if needed, but at the last deposition that was remote, Ms. -- it was a team manager Ms. Roboker (phonetic), who was located in Florida and could not travel so we offered to produce her remotely, and there was one single exhibit that was used that was a compilation that Mr. Schaffer had compiled that wasn't easily viewable, that the witness couldn't access -- you know, scroll through entirely for clarity for that. And then there were points in the deposition where, frankly, decorum was lost in a way that I don't expect it would be in person, and I don't want

to expose our witnesses to any more of that situation. I can be more specific if Your Honor likes.

THE COURT: No. I understand that.

Mr. Schaffer, just on the exhibit issue --

MR. SCHAFFER: Yeah.

THE COURT: -- is that something you could address going forward --

MR. SCHAFFER: And I have --

THE COURT: -- separately paginated and available?

MR. SCHAFFER: I have done -- very simply. I produce -- I always -- for Zoom depositions always deliver the documents to counsel in advance so they can provide --

THE COURT: Well, what happened with this deposition? What were the -- it sounds like there were some kind of technical issue.

MR. SCHAFFER: Nothing happened, Your Honor. I mean, I've been doing remote depositions with State Farm witnesses for a decade -- or not a decade. I --

THE COURT: Okay. Well, just -- let me just stop you there.

Ms. Hoffman, what would you -- what would be helpful in terms of exhibits that are done over Zoom depositions? Do they need to be separate documents? Is that what you're proposing?

MS. HOFFMAN: Yeah. I believe so, Your Honor.

THE COURT: Okay.

MR. SCHAFFER: I mean, I always provide them in advance. I'm happy to do that again.

THE COURT: I think -- Mr. Schaffer, I think it's just the -- whether they're compiled into one PDF. I assume it is here?

MR. SCHAFFER: So what she's talking about -- so of course I'm not compiling a single exhibit. What she's talking about is an exhibit which collects, essentially, strings of communications --

THE COURT: I see.

MR. SCHAFFER: -- to avoid giant -- you know, to avoid having a hundred exhibits and to avoid having giant strings, what we do is we -- you know, we basically excise the point of the email that is part of the string, and then we use that in a collective exhibit. If they want me to use separate strings -- so, Your Honor, in a claims communication like this, you --

THE COURT: No, no. I understand that, but I don't hear that to be Ms. Hoffman's concern.

Is that your concern --

MR. SCHAFFER: There's only one such exhibit.

THE COURT: -- (indecipherable.)

MR. SCHAFFER: There's only such exhibit that collects other communications across the claim. It's a

single exhibit. Everything else was a standalone exhibit with one document.

THE COURT: Okay.

Ms. Hoffman, was that your concern, though, the excerpt being -- I assume these are emails?

MS. HOFFMAN: That was one of the concerns, yes, Your Honor, that things are being excerpted and compiled in a way, and then questions are being asked, and later, you know, we'd want to avoid any suggestion that something was complete or full or authenticated based on the disconnect between the way the documents have been produced and the way that they were asked about it at a deposition.

THE COURT: Okay.

Well, Mr. Schaffer, I appreciate you're trying to keep the documents less burdensome, but just in the interest of avoiding conflict, why don't you produce the full email chains, and you can highlight the portions that you want to discuss.

MR. SCHAFFER: Very good, Your Honor. I actually --

THE COURT: Okay.

MR. SCHAFFER: I find the objection interesting because of course at trial --

THE COURT: Let's just move on. Let's --

MR. SCHAFFER: -- they -- no.

THE COURT: Mr. Schaffer, let's --
MR. SCHAFFER: They can object --
THE COURT: -- let's move on.
MR. SCHAFFER: All right. Fair enough.
THE COURT: Let's move on.
MR. SCHAFFER: Fair enough.
THE COURT: Ms. Hoffman, were there other logistical issues -- put aside the decorum issues. Were there other logistical issues with a Zoom deposition?
MS. HOFFMAN: Not at that one, Your Honor. I have --
THE COURT: Okay. I --
MS. HOFFMAN: -- had experience --
THE COURT: Let me just say that I agree with you in general that Zoom can sometimes not engender the best relations between people. There's something about being in person that is helpful in humanizing all of us, but, you know -- I'm also not crediting, Mr. Schaffer, any of the accusations against -- I assume it's you or your co-counsel here, but I think you --
MR. SCHAFFER: It's certainly me, Your Honor.
THE COURT: I think you've been put on notice that there were concerns raised. What I would propose is let's move forward with Zoom depositions. If there really is an issue at the next one or next couple, Ms. Hoffman, you're

free to raise it with the Court, and I'll be much more likely to impose more restrictions here, but it does seem for a case of this scope and given the geographies involved, it would be nice to be able to maintain Zoom depositions to keep the costs down.

MR. SCHAFFER: Your Honor, can I ask a question about that? So these depositions were originally set for July. Can we -- can I ask Your Honor to ask State Farm to provide -- and they were supposed to take place this week and next week, but we then ran into this issue.

THE COURT: Yeah.

MR. SCHAFFER: I would like to not have these depositions in 2027.

THE COURT: Fair.

MR. SCHAFFER: Can I ask counsel to work with me to get dates in November, please?

THE COURT: Ms. Hoffman, you think you can get people scheduled before the end of the year?

MS. HOFFMAN: Yes. Yes, we would, but, Your Honor, I would say that, you know, we will produce -- we object to producing these witnesses more than once. So, if Mr. Schaffer is still pressing forward with certain document requests and those resolutions haven't happened, we would object to producing these witnesses later.

THE COURT: Yeah, I'm not -- yeah, the standard --

we'll cross that bridge when we come down --

MS. HOFFMAN: Thank you, Your Honor.

THE COURT: -- down to the road (indecipherable). Yeah, but this is always an issue in litigation. So, you know, hope you two can work this out, but I understand your position.

Okay. Apex depositions. Mr. Schaffer, why don't you tell me why you think you need to talk to these high-ranking State Farm officials for this case.

MR. SCHAFFER: These are the witnesses who were ordered to be deposed in Oklahoma as relates to the Category 1 water programs or, in that case, focusing on hail and wind. They are parallel programs. These are the people who implemented the programs. These are the people who track the programs. These are people who -- their names are all over the documents. These are percipient witnesses to these programs. If in the end I don't get any of the program documents, the witnesses are of no value to me. I mean, Ms. Manduca --

THE COURT: Yeah.

MR. SCHAFFER: So let me just say -- Ms. Hoffman said earlier that they've offered to produce Ms. Manduca, but they offered to produce her conditional on an agreement that the scope was her declaration. So, if I get to depose Ms. Manduca about the programs after I get the document of

Case 2:26-cv-00452-CAS-MBK Document 78-1 Filed 01/12/26 Page 70 of 85 Page ID #:1870



course, because I would need the documents, I am perfectly happy to start with Ms. Manduca but --

THE COURT: Okay.

MR. SCHAFFER: That's the issue.

THE COURT: So let's just table this then pending the resolution of the documents, and perhaps, if it goes forward then -- Ms. Manduca's deposition. Are you -- Mr. Schaffer, are you -- have you done or are you planning to do a 30(b)(6)?

MR. SCHAFFER: I certainly will do a 30(b)(6) but --

THE COURT: Okay.

MR. SCHAFFER: -- I would imagine that given the -- that we're seven months into this and we're not even close to being halfway through, I would imagine we're talking about a trial continuance. So probably down the road once I --

THE COURT: No. I jut want to -- yeah, I'm just --

MR. SCHAFFER: Yeah. But of course. Yes.

THE COURT: I mean, I think that would factor into the Court's analysis of --

MR. SCHAFFER: Yeah.

THE COURT: -- whether apex depositions are necessary, whether some of these issues could be resolved in a 30(b)(6) --

MR. SCHAFFER: Yes.

THE COURT: -- or if (indecipherable) haven't been able to get the answers you need. So --

MR. SCHAFFER: Yes.

THE COURT: Okay.

MR. SCHAFFER: Yeah.

THE COURT: All right. Let's move on then. Next issue is --

MR. SCHAFFER: Can I -- I just -- one point of clarification. They have offered Ms. Manduca. She did have a declaration in the motion.

THE COURT: Yeah.

MR. SCHAFFER: I would like to depose her. I don't want to depose her without documents, and I don't want to depose her with a limited scope, but if you would like to --

THE COURT: Yeah.

MR. SCHAFFER: If everybody would like to put that off until the documents get resolved, I'm okay with that.

THE COURT: It sounds like that would probably be the best course of action here. I doubt Ms. Hoffman has any objection to that.

MS. HOFFMAN: No objection, Your Honor.

THE COURT: Okay. All right. The third-party subpoenas. Mr. Schaffer, is it correct you represent all these third parties?

MR. SCHAFFER: Correct. These are family members,

Your Honor.

THE COURT: Okay. What is the objection to the subpoenas?

MR. SCHAFFER: Well, it depends on which -- I mean, there's some categories that are, you know, "We want all your phone records," and "We want," you know, "your retainer agreements," and "We want" -- you know, they're just wildly overbroad.

I mean, if what they want is documents relating to -- specifically to this insurance claim or to observations or relating to the loss, I think that's perfectly reasonable, and I think we would agree to that, but the subpoenas are -- you know, they ask for phone records from adult residents of the house for, you know, two months without limit to, you know, records relating to the loss. I mean, they're -- it's plainly private information, and these are not parties in the case, and Ms. Canliwocker (phonetic), who is the nonresident adult daughter, did assist them with the claim, but she was by no means, you know, the representative in the claim. And so I just think the -- you know, the limitation should be documents and, you know, frankly, depositions that are related to, specifically, issues in the loss -- percipient knowledge.

THE COURT: Okay. These are document subpoenas that were sent, Ms. Hoffman?

MR. SCHAFFER: Correct.

THE COURT: Okay.

MS. HOFFMAN: They're document subpoenas and then two deposition subpoenas and the two deposition --

THE COURT: Okay.

MS. HOFFMAN: -- subpoenas are to the two who were included in plaintiff's Rule 26 disclosures.

MR. SCHAFFER: And we have not --

THE COURT: Okay.

MR. SCHAFFER: -- objected to the depositions. We just objected to the depositions before we resolve the document disputes because we don't want to do it twice, like they don't.

THE COURT: Got it.

MS. HOFFMAN: And --

THE COURT: Okay. So, Ms. Hoffman, on the substance of the document subpoenas -- yeah, go ahead.

MS. HOFFMAN: They are narrowly tailored, Your Honor. We disagree with Mr. Schaffer's description. I'll read you the first document category: Documents constituting communications from October 4 through October 15, 2025, with the plaintiffs; with Kayla Walker, who is the plaintiff's daughter and the designated insurance representative; and with anyone else residing at the property. So it's a nine-day period, and that's the period

between when the constant use of gas began at the property to when the remediation was done at the property. So that's the nine days. All of those folks live there --

THE COURT: But "all communications" or those that are -- is it tailored in some way to the claims and defenses in this case?

(Multiple speakers.)

THE COURT: -- in that ten-day period?

MS. HOFFMAN: It's tailored because that is the ten-day period, and it's tailored to the people involved in the suit and living at the property where --

THE COURT: All right. I -- yeah, I don't see any basis to get information exchanged between family members that doesn't relate to the water-loss damage claim here. So if you're willing to agree to that, that seems clearly relevant, and I don't hear Mr. Schaffer saying -- and I don't see any basis that they're talking about what they're going to have for dinner tonight -- that you can get discovery into that.

MS. HOFFMAN: Well, Your Honor, if I may.

THE COURT: Yeah.

MS. HOFFMAN: "What they're going to have for dinner tonight" could very well relate to this, and here's the issue: The utility records show continuous gas usage at the property, continuing for days after the plaintiff's

plumber was there and after they reported it to State Farm, and that shows a progression and an increase in the amount of loss, and it shows a continuous seepage or leakage. The plaintiffs deny -- deny -- that they used hot water. There's a dispute as to whether it was -- the plaintiffs appear to dispute these utility records. We don't know on what basis yet, but that's why this can relate because, if they're using hot water or not, that directly relates to the issue in the case and directly relates to how long this has been going. So it relates to are they leaving the property to shower, or is there no issue with that and they're staying there? Those are directly in dispute, and they're really at the heart of this coverage question here if they're -- we don't understand what basis they would have to dispute the utility records, but according to Mr. Schaffer, they are.

THE COURT: All right. Can -- sorry. Explain that to me again. The plaintiffs are claiming what happened, and what do you think contradicts their position?

MS. HOFFMAN: The plaintiffs are claiming that they did not have hot water at the property, but the plaintiffs say because they didn't try to use it. The plaintiffs -- I believe Mr. Schaffer in the briefing in this said that the utility records don't show what we understand them to show. So I'm not sure how they plan to dispute the continuous usage that started on the 4th and ended right when the -- on the

day that the plumber came and ultimately fixed it, not the day he inspected it and diagnosed the leak but on the day he fixed it. That was days later. And that's a central issue, and that is a factual question in relation to this particular claim.

THE COURT: Okay.

MS. HOFFMAN: So that's why the request was phrased in the way it was, and it was narrowly tailored to only those folks living at the property in those nine days where the question of hot water is in dispute.

THE COURT: But you want to know if they were using hot water in this time period? That's what you're trying to figure out?

MS. HOFFMAN: I'm sorry, Your Honor. You dropped off.

THE COURT: Okay. Sorry. You were trying to figure out if they were using hot water in this period?

MS. HOFFMAN: We want to understand the discussions about that, yes.

THE COURT: Okay.

Mr. Schaffer --

MS. HOFFMAN: (Indecipherable.)

MR. SCHAFFER: So, I mean, I won't waste your time -- Your Honor's time on the coverage question because Ms. Hoffman's -- she just completely mischaracterized our

view, but it doesn't matter because the reality is if she just asks -- first of all, document requests -- so what she's talking about are essentially communications between members --

THE COURT: (Indecipherable.)

MR. SCHAFFER: -- of the family. If she just confines it to the loss, water usage, I'm fine with it. I mean, it's just that she's not confined it at all. This idea that it's for a period of time -- I mean, people are communicating about lots of personal things, and again, these are not party witnesses. So as long as the requests are understood to relate to the loss, water usage, the plumber -- I mean, the obvious things -- of course we don't object to that. I mean, this -- you know, why would we --

THE COURT: So what I would propose here is, Ms. Hoffman, you start with what Mr. Schaffer is willing to give you with his -- as I hear him saying, he will disclose any text messages or emails about water usage -- that relate to water usage. And you're going to depose one of the family members that's there; is that right?

MR. SCHAFFER: Two.

MS. HOFFMAN: Your Honor, if I may. The time to produce has past, and nothing had been produced.

THE COURT: Okay.

MS. HOFFMAN: So we would appreciate that

production as soon as possible so we can move forward.

THE COURT: Right. But sorry. You've agreed --

MS. HOFFMAN: So I appreciate that very much.

THE COURT: -- to depose?

MS. HOFFMAN: Ms. Walker, who is the designated insurance representative, and Ms. Daniels, who is also --

THE COURT: Okay. And Ms. Walker doesn't live on the property, or does she?

MR. SCHAFFER: Does not.

MS. HOFFMAN: Correct. Correct.

THE COURT: Okay. So, when you depose the family member, you'll get additional insight into what was transpiring during this ten-day period. If you feel like you haven't gotten what you should have from text messages, you know, it turns out they were playing in the swimming pool -- I don't -- can't imagine what it would be, but you can then come back and seek additional discovery.

MR. SCHAFFER: No swimming pool, Your Honor.

THE COURT: Is that an amendable temporary solution here? Otherwise, I will authorize you to file a motion to compel on this, but I will look at -- I'll just warn you I'm going to be pretty skeptical because I don't see the need for (indecipherable) discovery into their interfamily communications.

MS. HOFFMAN: Which is why we kept it narrow,

Your Honor, just to those dates.

THE COURT: Okay. So -- okay. So is that -- so that's how we'll proceed then?

Mr. Schaffer, you're going to produce -- by what -- when can you produce these documents responsive --

MR. SCHAFFER: Thirty days is fine, Your Honor.

THE COURT: Thirty days. And you don't have depositions set yet; correct?

MR. SCHAFFER: Does not.

THE COURT: All right. Okay. I'm not going to order this -- some of these agreements. You -- this is memorialized here on this IDC. Both of you are taking good notes. I look equally unkindly on people not complying with their agreements as I do with court orders, particularly where it's clear. So just because it won't be in the minute order that follows here, I do expect the parties to comply with whatever agreements are reached here.

MR. SCHAFFER: Understood, Your Honor. Thank you.

THE COURT: Okay. The last issue -- oh, this is the interrogatories.

Ms. Hoffman, do you think we've now resolved it in light of the conversation on the RFPs? (Indecipherable) --

MS. HOFFMAN: Yeah, I think we -- this is what we've addressed in connection with going back to the data folks and coming and meeting on the 23rd and -- yes, that's

my understanding, Your Honor.

THE COURT: Okay.

MS. HOFFMAN: This was Mr. Schaffer's --

THE COURT: Okay.

MS. HOFFMAN: -- IDC request.

MR. SCHAFFER: Yes, Your Honor. I think --

THE COURT: So, Mr. Schaffer, you're satisfied?

MR. SCHAFFER: I'm deeply --

THE COURT: Okay.

MR. SCHAFFER: -- deeply satisfied, Your Honor.

THE COURT: Okay. That's what we're aiming for here at the Central District of California.

MR. SCHAFFER: Which is not hard to -- not easy to achieve; let me tell you.

THE COURT: Yeah. Okay. So I think that covers all the issues we were going to today. The parties have a fair amount of homework to do. I'm not going to set another IDC at this point, although I do expect to hear from one or both of you soon, and then at that point we can talk about a path forward in terms of if we want to set this for some regular status conferences, although I don't know if that's really going to be necessary here or not. And I will -- I may call you in again after I get the additional briefing on the RFPs because I am just -- you two know a whole lot more about this stuff through the collective experiences

litigating this cases, and I'm still struggling my way through it. So I expect that follow-up hearing would be much shorter and pointed and --

MR. SCHAFFER: I would expect our submission to be wildly useful to Your Honor because I intend to make it very, very --

THE COURT: That's what I like to hear.

MR. SCHAFFER: -- very concrete.

THE COURT: Yeah.

MR. SCHAFFER: I've heard you, and I intend to try to assist you and us all --

THE COURT: Okay. Thank you.

MR. SCHAFFER: -- by making that very concrete.

THE COURT: Okay. Can I ask one other final issue of the parties? Have you -- have the parties here talked settlement yet?

MS. HOFFMAN: Your Honor --

MR. SCHAFFER: We actually -- Your Honor, we actually had a very early mediation in the case, and it was a --

THE COURT: Okay.

MR. SCHAFFER: -- I would describe it as an unmitigated disaster, from our perspective.

THE COURT: Okay.

MR. SCHAFFER: So we do have a meeting with the

court on the 19th to, you know, I guess give her an update on the -- on that issue but I -- you know, Ms. Hoffman and I had a good conversation about this a few days ago and I -- you know, from our perspective, until there's substantial movement on the documents and substantial movement on dispositive motions going both ways, I would expect, I don't see that as a -- as if there's a meaningful chance, but, you know, as we hear from defense lawyers all the time, we're always open to conversation.

THE COURT: Yeah.

Ms. Hoffman, did you want to --

MS. HOFFMAN: Yeah. Thank you, Your Honor. Yes. I raised the issue in the upcoming hearing with Judge Snyder with Mr. Schaffer about a week ago. I think we agree that a further private mediation session at this point would not be productive, particularly a --

THE COURT: Okay.

MS. HOFFMAN: -- Zoom mediation session, and I think we're going to let Judge Snyder know that next week and --

THE COURT: Okay.

MS. HOFFMAN: -- she would prefer. But we welcome your --

THE COURT: All right. Well --

MS. HOFFMAN: -- guidance as well.

Case 2:26-cv-00452-CAS-MBK Document 68-1 Filed 01/02/26 Page 83 of 85 Page ID #:1805



THE COURT: No, I'm glad to hear you at least broached the subject early. That's always helpful. It just seemed like this case is about to get quite -- it already is quite litigious, and you've already -- both counsel, seems like, spent a lot of resources on the case. I'm not sure what the valuation would here -- be here, but this is getting to the point where I would think it would be helpful for both sides to take a step back and think about whether it's really worth pouring a lot more litigation resources into a case like this, but if that happened already and you don't think it's worthwhile to talk again, I respect that.

MR. SCHAFFER: Your Honor, does this court -- you know, one of the issues relating to the -- to our side is just the economics of it because the -- you know, the various in-person depositions on State Farm's side and so forth are -- you know, they're not insignificant in terms of costs. Does the court have a -- you know, a magistrate-overseen settlement program or --

THE COURT: We do. It's one of the (indecipherable) programs we have.

MR. SCHAFFER: Okay.

THE COURT: The parties can request magistrate judges. I do them all the time. Often for the cases where I am the discovery judge -- we don't generally handle them if we're going to be handling substantive motions in cases, but

this is not a case where I would be.

MR. SCHAFFER: Yeah.

THE COURT: So, if you would like to do a mediation with me or any of my colleagues, we're quite good at this. I do think it can be helpful for -- particularly for clients to hear from a judge, even if we're not "the" judge. So, if you think that would be helpful here, you know, we are open for business. You can just let Judge Snyder know, and she would refer it to me or to a different magistrate judge.

MR. SCHAFFER: Great. We will definitely discuss that because that would be an attractive option for us.

THE COURT: Okay. Sounds good.

All right. Thank you all for your time and walking me through this, and, yeah, we'll be in touch.

MR. SCHAFFER: Thank you, sir.

MS. HOFFMAN: Thank you, Your Honor.

THE CLERK: Court is adjourned.

(Proceedings adjourned at 2:36 p.m.)

///

///

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/ Julie Messa
Julie Messa, CET**D-403
Transcriber

October 18, 2026
Date